# United States Court of Appeals for the Federal Circuit

---

**INTERDIGITAL COMMUNICATIONS, LLC** AND
**INTERDIGITAL TECHNOLOGY CORPORATION,**
*Appellants,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

AND

**NOKIA INC.** AND **NOKIA CORPORATION,**
*Intervenors.*

---

2010-1093

---

On appeal from the United States International Trade Commission in Investigation No. 337-TA-613.

---

ON PETITION FOR PANEL REHEARING
AND REHEARING EN BANC

---

PATRICK J. FLINN, Alston & Bird LLP, of Atlanta, Georgia, filed a combined petition for panel rehearing and rehearing en banc for intervenors. With him on the petition were JOHN HAYNES, of Atlanta, Georgia, and ROSS R. BARTON, of Charlotte, North Carolina. Of counsel on the petition was PAUL D. CLEMENT, Bancroft PLLC, of Washington, DC.

DONALD R. DUNNER, Finnegan, Henderson, Farabow, Garrett & Dunner, LLP, of Washington, DC, filed a response to the petition for appellants. With him on the response were ALLEN M. SOKAL, DON O. BURLEY, SMITH R. BRITTINGHAM IV, and HOUTAN KHALILI ESFAHANI, of Washington, DC, and CHRISTOPHER P. ISAAC, of Reston, Virginia. Of counsel on the response were SETH P. WAXMAN and WILLIAM G. MCELWAIN, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, DC, and MARK C. FLEMING and LAUREN B. FLETCHER, of Boston, Massachusetts.

MEGAN M. VALENTINE, Attorney Advisor, Office of General Counsel, United States International Trade Commission, of Washington, DC, filed a response to the petition for appellee. With her on the response were DOMINIC L. BIANCHI, Acting General Counsel, and ANDREA C. CASSON, Assistant General Counsel for Litigation.

DARYL JOSEFFER, King & Spalding LLP, of Washington, DC, filed a response to the petition for amici curiae Hewlett-Packard Co., et al. With him on the response were JEFFREY TELEP and ADAM CONRAD.

———————————

Before RADER, *Chief Judge*, NEWMAN, MAYER, LOURIE, BRYSON, DYK, PROST, O'MALLEY, REYNA, and WALLACH, *Circuit Judges.*[*]

PER CURIAM.

———————————

[*] Judge Bryson assumed senior status on January 7, 2013. Circuit Judge Moore did not participate in the vote.

## O R D E R

A combined petition for panel rehearing and for rehearing en banc was filed by Intervenors, and responses to the petition were invited by the court and filed by Appellants and Appellee. By leave of court, a response to the petition was filed by Hewlett-Packard Co., et al., as amici curiae. The petition for rehearing and responses were considered by the panel that heard the appeal, and thereafter the petition for rehearing en banc and responses were referred to the circuit judges who are in regular active service.

Upon consideration thereof,

IT IS ORDERED THAT:

(1) The petition for panel rehearing is denied, and a panel opinion and dissent are attached herewith.

(2) The petition for rehearing en banc is denied.

(3) The mandate of the court shall issue on January 17, 2013.

FOR THE COURT

January 10, 2013                    /s/ Jan Horbaly
        Date                        Jan Horbaly, Clerk

# United States Court of Appeals for the Federal Circuit

_____

INTERDIGITAL COMMUNICATIONS, LLC, AND
INTERDIGITAL TECHNOLOGY CORPORATION,
*Appellants,*

v.

INTERNATIONAL TRADE COMMISSION,
*Appellee,*

AND

NOKIA INC. AND NOKIA CORPORATION,
*Intervenors.*

_____

2010-1093

_____

Appeal from the United States International Trade Commission in Investigation No. 337-TA-613.

_____

Decided: January 10, 2013

_____

ON PETITION FOR REHEARING

_____

Before NEWMAN, MAYER, and BRYSON,[*] *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* BRYSON.
Dissenting opinion filed by *Circuit Judge* NEWMAN.

BRYSON, *Circuit Judge.*

Intervenors Nokia Inc. and Nokia Corporation (collectively, "Nokia") have petitioned for rehearing on one of the issues presented in this case: whether InterDigital's patent licensing activities satisfied the "domestic industry" requirement of section 337 of the Tariff Act of 1930, 19 U.S.C. §§ 1337(a)(2) and 1337(a)(3). Because Nokia has made a much more detailed argument with respect to that issue on rehearing than it did in its brief on the merits, a response to Nokia's expanded submission is appropriate.

1. In its textual argument, Nokia focuses on the phrases "relating to the articles protected by the patent" and "with respect to the articles protected by the patent" in paragraphs 337(a)(2) and 337(a)(3). Paragraph 337(a)(2) provides that the bar to importation of infringing goods established by section 337 applies "only if an industry in the United States, relating to the articles protected by the patent . . . exists or is in the process of being established." Paragraph 337(a)(3) then states that an industry in the United States "shall be considered to exist if there is in the United States, with respect to the articles protected by the patent" significant investment in plant or equipment, significant employment of labor or capital, or "substantial investment in its exploitation, including engineering, research and development, or licensing." The parties agree that the word "its" in the

---

[*] Judge Bryson assumed senior status on January 7, 2013.

last clause of paragraph 337(a)(3) refers to the intellectual property at issue.

Nokia argues that the International Trade Commission and this court have not properly construed the phrases "relating to the articles protected by the patent" and "with respect to the articles protected by the patent" that appear in those two subsections. The Commission and the court construed those phrases to define the subject matter that is within the statute's protection. With respect to subparagraph (A) of paragraph 337(a)(3), the "significant investment in plant or equipment" that is required to show the existence of a domestic industry must exist "with respect to the articles protected by the patent" in question. That requirement will typically be met if the investment in plant and equipment is directed at production of articles protected by the patent. Similarly, with respect to subparagraph (B) of paragraph 337(a)(3), the "significant employment of labor or capital" that is required to show the existence of a domestic industry must exist "with respect to the articles protected by the patent." That requirement will likewise typically be met by a showing that significant labor or capital is being expended in the production of articles protected by the patent. Applying the same analysis to subparagraph (C) of paragraph 337(a)(3) produces a parallel result that is consistent with the Commission's and this court's statutory construction: The "substantial investment in [the patent's] exploitation, including engineering, research and development, or licensing" must be "with respect to the articles protected by the patent," which means that the engineering, research and development, or licensing activities must pertain to products that are covered by the patent that is being asserted. Thus, just as the "plant or equipment" referred to in subparagraph (A) must exist with respect to articles protected by the patent, such as by

producing protected goods, the research and development or licensing activities referred to in subparagraph (C) must also exist with respect to articles protected by the patent, such as by licensing protected products. This accords with the common description of the domestic industry requirement as having two "prongs": the "economic prong," which requires that there be an industry in the United States, and the "technical prong," which requires that the industry relate to articles protected by the patent. *See Certain Stringed Musical Instruments and Components Thereof ("Stringed Musical Instruments")*, Inv. No. 337-TA-586, USITC Pub. 4120, Comm'n Op., at 13-14 (Dec. 2009); *Certain Variable Speed Wind Turbines and Components Thereof*, Inv. No. 337-TA-376, USITC Pub. 3003, Comm'n Op., at 14-18 (Nov. 1996).

As noted in the panel opinion in this case, the Commission has consistently construed subparagraph (C) in that manner. *See Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same ("Multimedia Display and Navigation Devices")*, Inv. No. 337-TA-694, USITC Pub. 4292, Comm'n Op., at 7-8 (Nov. 2011) (to satisfy the domestic industry requirement by proof of investment in patent licensing requires a showing (1) that the investment relates to the exploitation of the asserted patent, (2) that it relates to licensing, (3) that it is domestic, and (4) that it is substantial). In addition to the cases cited in the panel opinion, earlier Commission decisions adopting the same statutory interpretation include *Certain Digital Processors and Digital Processing Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-559, Initial Determination (May 11, 2007), 2007 WL 7597610, at *53-*57; *Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same*, Inv. No. 337-TA-432, Order No. 13 (Jan. 24, 2001),

2001 WL 1877710, at *6-*8; *Certain Digital Satellite System (DSS) Receivers and Components Thereof*, Inv. No. 337-TA-392, USITC Pub. 3418, Initial and Final Recommended Determinations, at 8-10 (Apr. 2001); *Certain Dynamic Sequential Gradient Compression Devices and Component Parts Thereof*, Inv. No. 337-TA-335, USITC Pub. 2575, Initial Determination, at 58-61 (Nov. 1992); and *Certain Microcomputer Memory Controllers, Components Thereof and Products Containing Same*, Inv. No. 337-TA-331, Order No. 6 (Jan. 8, 1992), 1992 WL 811299, at *3-*4 ("Where the patented products are manufactured is not relevant to the subsection (C) issue."). The two Commission decisions from the 1990s cited by Nokia are inapposite, as they do not involve licensing, and they do not purport to interpret subparagraph (C). The two Commission decisions from the 1990s cited by the dissent are also inapposite, as they involve cases in which the complainants were not exploiting the asserted patents, contrary to paragraph 337(a)(2), which "requires that the domestic industry relate to the articles protected by the patent." *See Certain Integrated Circuit Telecommunication Chips and Products Containing Same Including Dialing Apparatus*, Inv. No. 337-TA-337, USITC Pub. 2670, Initial Determination, at 99 n.87 (Aug. 1993).

This is a classic case for the application of subparagraph (C). The evidence before the Commission showed that InterDigital is a large, publicly traded company (NASDAQ ticker symbol IDCC). Since 1993, the administrative law judge found, InterDigital "has been engaged in research, development, engineering, and licensing of Code Division Multiple Access (CDMA) technology in the United States which work later transitioned into research, development, engineering, and licensing of Wideband CDMA technology (WCDMA)." InterDigital's proprietary technology is incorporated in the communica-

tions standards referred to as 3G. InterDigital has engaged in some production of products, but it is principally dedicated to research and licensing intellectual property in the cellphone industry. As the administrative law judge found, InterDigital "licenses its wireless technology and patents to significant handset and device manufacturers throughout the world." Between 1993 and 2006, the evidence showed, InterDigital invested a total of approximately $7.6 million in salaries and benefits for employees engaged in its licensing activities, and it received almost $1 billion in revenues from portfolio licenses (including the patents in suit) relating to its cellphone technology, which includes about $400 million attributable to licenses to its 3G technology. The administrative law judge found (and there is no argument to the contrary) that InterDigital's activities involve "substantial investment in . . . licensing." 19 U.S.C. § 1337(a)(3)(C). The record also reveals substantial investment by InterDigital in the research and development that led to the patents in suit. The only question is whether the InterDigital's concededly substantial investment in exploitation of its intellectual property is "with respect to the articles protected by the patent." That requirement is satisfied in this case because the patents in suit protect the technology that is, according to InterDigital's theory of the case, found in the products that it has licensed and that it is attempting to exclude.

Nokia argues that more is required by the phrase "with respect to the articles protected by the patent," but it is notably vague about what exactly that is. Nokia concedes that it is not necessary that the "articles" in question be manufactured in the United States (Pet. 9

n.1),[1] and it does not assert that the articles in question must be produced by licensees of the patentee. Instead, Nokia variously asserts that "there must be 'articles protected by the patent'" (Pet. 4), that the only licensing activity that matters is "activity 'with respect to the articles protected by the patent'" (Pet. 4), that "the licensing activity must be tethered to a tangible good" (Pet. 6), and that the technology covered by the patent must be "put into practical use" (Pet. 6). At another point, Nokia asserts that subparagraph 337(a)(3)(C) was designed to allow the Commission "to take action to protect those who do not themselves produce goods practicing their patents, but who work with others to do so" (Pet. 9). But that is the very definition of licensing, and as of the time this case was tried, InterDigital had 24 revenue-producing licenses to its U.S. patents, including the patents at issue, with major manufacturers of wireless devices, including Samsung, LG, Matsushita, Apple, and RIM. Whatever Nokia means by the expression "work[ing] with others" to produce goods practicing the patents, it is unclear why that description of the statutory test would not apply to a licensor such as InterDigital.[2]

---

[1]     Although Nokia disclaims that argument, it is the centerpiece of the dissent.

[2]     To the extent Nokia's argument is based on concern that the statute will be used to grant a remedy to any domestic patent owner, no matter what the scale of its activities in exploiting the patent, both this court and the Commission have made clear that the investment in engineering, research and development, or licensing must be sufficiently substantial to constitute a domestic industry. *See John Mezzalingua Assocs. v. Int'l Trade Comm'n*, 660 F.3d 1322 (Fed. Cir. 2011) (upholding Commission decision that complainant's licensing activities were insufficiently substantial to constitute a domestic industry); *Multimedia Display and Navigation Devices*, at 23-

2. The statutory language at issue in this case was added to section 337 in 1988. The legislative history of the 1988 amendment to section 337 supports the plain reading of the statute set out above. Nokia attempts to cobble together support for its position from portions of the legislative history, but a fair and comprehensive examination of the legislative background of the amendment makes clear that cases such as this one were precisely the kinds of cases that Congress wanted to bring within the purview of section 337.

Prior to the 1988 amendment, section 337 required proof that that the challenged importation of articles into the United States had the effect or tendency "to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry." 19 U.S.C. § 1337(a) (1982). The Commission interpreted that language to require proof of the existence (or prospect) of a domestic industry that was manufacturing the articles protected by intellectual property before the Commission could bar the import of infringing products. *See, e.g., Certain Miniature, Battery-Operated, All-Terrain, Wheeled Vehicles*, Inv. No. 337-TA-122, USITC Pub. 1300 (Oct. 1982), *aff'd*, *Schaper Mfg. Co. v. U.S. Int'l Trade Comm'n*, 717 F.2d 1368 (Fed. Cir. 1983). Objections were raised that sec-

---

25 (holding complainant's activities relating to licensing too limited to constitute a "substantial investment" under subparagraph 337(a)(3)(C)); *Stringed Musical Instruments*, at 16-17, 25-27 (complainant "has not provided sufficient evidence of substantial investment of the type described in section 337(a)(3)(C) to show that an industry in the United States exists"; "'mere ownership of a patent . . . would not be sufficient to satisfy this test'"). Here, furthermore, InterDigital's investment included substantial research and development leading to the patents in suit as well as licensing activity.

tion 337, construed in that manner, did not provide protection for innovators who did not actually produce goods in this country, but who were injured by the importation of goods that incorporated the technology that they had invented or sought to license. Accordingly, proposals were introduced in Congress to expand the coverage of section 337 so that it would provide protection for American industries that did not manufacture products but were engaged in engineering, research and development, or licensing of the technology that others used to make products. Those proposals matured into a statutory change that provided protection for industries that were based on the creation and exploitation of intellectual property even if they did not produce the ultimate products that embodied that technology.

The background of that statutory change and the contemporaneous explanations of why it was made are highly illuminating. Because of certain Commission decisions applying the "industry" requirement of the pre-1988 version of section 337 restrictively, proposals were introduced in Congress to modify or eliminate that requirement. When introducing his bill to amend section 337, Senator Lautenberg explained that the new legislation was designed to "keep out of the U.S. market products that steal American innovations," and to "strengthen our ability to exclude products that infringe patents, copyrights, trademarks, and semiconductor designs." 99 Cong. Rec. 2904 (1986). The amendment was directed at "foreign firms [that] pirate American inventions, and then ship those products back here." *Id.* To exclude foreign goods, he added, "proof of piracy should be enough. . . . If a[n] import infringes U.S. intellectual property rights, it ought to be excluded. And this amendment would make that clear." *Id.* He explained that it was not appropriate to require production in the United States in order for

section 337 to be available as a remedy: "Today in order to get relief inventors must exploit their invention by production in the United States. For better or worse, we are more and more an information based economy. For those who make substantial investments in research, there should be a remedy. For those who make substantial investments in the creation of intellectual property and then licensing, there should be a remedy." *Id.*

In parallel remarks to the House of Representatives, Representative Kastenmeier noted that an objection had been raised to amending section 337 if it would allow "foreign patent holders . . . to use the ITC to seek to exclude either their foreign or American competition from obtaining access to the U.S. market." That objection would be addressed, he explained, by modifying the domestic injury requirement in the statute "by allowing complaints to be filed by persons who have made a substantial investment in facilities or activities relating to the exploitation of a patent, copyright, trademark, or mask work, including research and development, licensing, sales, and marketing." 132 Cong. Rec. 7119 (1986). That adjustment, he added, "will assure continued access to the ITC by entities, including universities, who have a substantial stake in the United States," and it would avoid the result of denying ITC relief "notwithstanding the existence of a larger service industry exploiting the intellectual property right within the United States." *Id.* Such a change would "enable universities and small businesses who do not have the capital to actually make the good in the United States to still have access to the ITC forum for the protection of their rights." *Id.*

At the hearings on the legislation to amend section 337, there was opposition to the complete elimination of the industry requirement, on the ground that to do so

would convert the Commission's mission from a trade forum into an intellectual property court, and that eliminating the industry requirement would allow foreign owners of U.S. patents to bring exclusion actions before the Commission even though they had no substantial U.S. connections. *See Intellectual Property and Trade: Hearings before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm. on the Judiciary* ("House Judiciary Hearings"), 99th Cong. 6, 23, 470-72 (1986) (statements of Paula Stern, Chairwoman, Int'l Trade Comm'n); *Intellectual Property Rights: Hearings before the Subcomm. on Int'l Trade of the S. Finance Comm.* ("Senate Hearings"), 99th Cong. 57, 65 (1986) (statements of Paula Stern, Chairwoman, Int'l Trade Comm'n). Those who favored the administration's proposal to eliminate the industry requirement altogether pointed out that the industry requirement in then-current law "prevents intellectual property owners such as universities and research institutions from using the ITC for enforcing their patents." House Judiciary Hearings at 48, 61 (statements of Harvey E. Bale, Jr., Assistant U.S. Trade Representative); *Trade Reform Legislation: Hearings before the Subcomm. on Trade of the H. Comm. on Ways and Means* ("1986 House Ways and Means Hearings"), 99th Cong. 354 (1986) (statement of Clayton Yeutter, U.S. Trade Representative); Senate Hearings at 92 (statement of Harvey E. Bale, Jr., Assistant U.S. Trade Representative). Others favored a compromise in which the industry requirement would be retained but amended to cover "U.S. organizations, universities or private, or even individuals whose function it is to do and license research whether or not they actually manufacture." 1986 House Ways and Means Hearings at 670 (statement of Richard C. Witte, Vice President, Intellectual Property Owners, Inc.).

In the end, a compromise approach along the lines proposed by Representative Kastenmeier was adopted. The compromise bill retained the industry requirement but made clear that it would not be necessary for a complainant to prove that patent-protected goods were being produced in this country. Instead, the bill provided that the industry requirement could be met even in the absence of domestic production if there was substantial domestic investment in engineering, research and development, or licensing.

Various private parties, including industry representatives and the Intellectual Property Owners organization expressed support for the compromise bill. *See* Senate Hearings at 175, 179-80 (statements of Donald H. Swan, Corporate Group Vice President, Monsanto Co.); *id.* at 188, 193-94 (statements of Richard C. Witte, Vice President, Intellectual Property Owners, Inc.); *Comprehensive Trade Legislation: Hearings before the Subcomm. On Trade of the H. Comm. on Ways and Means*, 100th Cong. 275 (1987) (statement of William T. Archey, Vice President, U.S. Chamber of Commerce).[3]

The similarly worded House and Senate committee reports on the compromise bill explained that the amendment to section 337 was intended "to strengthen the effectiveness of section 337 in addressing the growing problems being faced by U.S. companies from the importation of articles which infringe U.S. intellectual property rights." H.R. Rep. No. 100-40, Pt. 1, at 155 (1987) ("House Report"); S. Rep. No. 100-71, at 128 (1987) ("Senate

---

[3] The background and history of the legislation is summarized in detail at several places in the congressional hearings that led to the 1988 amendment to section 337. *See* House Judiciary Hearings at 497-508; Senate Hearings at 5-20.

Report"). The legislation achieved that objective by eliminating the requirement to show injury to (or the prevention of the establishment of) a domestic industry as a result of the importation in question. House Report at 155; Senate Report at 128. Nonetheless, Congress retained the requirement that "a U.S. industry relating to the articles or intellectual property right concerned 'exists or is in the process of being established.'" House Report at 156-57; Senate Report at 129. That requirement was being retained, the reports explained, "in order to preclude holders of U.S. intellectual property rights who have no contact with the United States other than owning such intellectual property rights from utilizing section 337." House Report at 157; Senate Report at 129. While seeking to bar the use of section 337 by patent holders with no connection to the U.S. other than their ownership of a U.S. patent, however, the report made clear that it was intended to protect domestic industries that were exploiting patents through means such as engineering, research and development, or licensing. Those domestic industries, even if not actually producing goods, would nonetheless be beneficiaries of section 337, thus preserving "[t]he purpose of the Commission [which] is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States [including a licensing industry] retains that essential nexus." House Report at 157; Senate Report at 129.

Importantly for this case, the reports explained that the new statutory provision "does not require actual production of the article in the United States if it can be demonstrated that significant investment and activities of the type enumerated are taking place in the United States." House Report at 157; Senate Report at 129. The

new statute, the reports added, would "encompass universities and other intellectual property owners who engage in extensive licensing of their rights to manufacturers." House Report at 157; Senate Report at 129. The reports again emphasized that the committees did not "want to see this language used as a loophole to the industry requirement," but intended the new language "to protect from infringement those holders of U.S. intellectual property rights who are engaged in activities genuinely designed to exploit their intellectual property within a reasonable period of time," exploitation which, by the statutory definition, included substantial investment in engineering, research and development, or licensing. House Report at 157-58; Senate Report at 130.[4]

---

[4]    In arguing that proof of a licensing industry under subparagraph 337(a)(3)(C) requires proof that the licensed products are manufactured domestically, the dissent interprets the term "domestic industry" to mean "domestic manufacturing industry." The statute, however, does not say that, nor does the legislative history. When Congress modified the domestic industry requirement in 1988, it expanded the "industry" category by providing that a licensing business could qualify as a domestic industry if it involved "substantial investment in [a patent's] exploitation." To read subparagraph 337(a)(3)(C) as if it required proof of domestic manufacture would ignore that the three subparagraphs of paragraph 337(a)(3) are in the disjunctive and that the required elements of a domestic industry under subparagraphs 337(a)(3)(A) and (B) do not apply to the domestic industry requirement of subparagraph 337(a)(3)(C).

The dissent also interprets references to the word "manufacturer" in the legislative history and Commission decisions to mean "domestic manufacturer," *e.g.*, dissent at 10, 15, 26-27, but there is no basis either in the language or the context of the cited references for reading that qualification into the term. The cited materials merely acknowledge that a sufficiently substantial domes-

3. Nokia and the dissent cite three of this court's decisions in support of its claim that the panel's decision in this case departs from prior circuit precedent, *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003); *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351 (Fed. Cir. 2007), and *Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294 (Fed. Cir. 2010). Those cases deserve only brief attention, as they do not address the issue presented in this case. In each case, the question before the court was whether the domestic industry requirement was met based on domestic production, and the question on which the court focused was whether the products of the claimed domestic production were covered by the asserted patent claims. There was no question in those cases as to the scope of subparagraph 337(a)(3)(C), and there was certainly no holding (or even dictum) in any of those cases suggesting that a domestic licensing industry could qualify under subparagraph 337(a)(3)(C) only if goods protected by the patent or patents in suit were produced domestically. This court's decision in *John Mezzalingua Associates v. International Trade Commission*, 660 F.3d 1322 (Fed. Cir. 2011), also does not support Nokia or the dissent. In that case, the Commission and the court held that the complainant's litigation expenses did not constitute a substantial investment in exploitation of the asserted patents through licensing; the court did not hold that products covered by the patents had to be manufactured in this country.

\* \* \* \* \*

---

tic licensing industry will need to license its technology to a manufacturer somewhere; they do not say that the manufacturer must be domestic.

Here's where all this leaves us: Under the clear intent of Congress and the most natural reading of the 1988 amendment, section 337 makes relief available to a party that has a substantial investment in exploitation of a patent through either engineering, research and development, or licensing. It is not necessary that the party manufacture the product that is protected by the patent, and it is not necessary that any other domestic party manufacture the protected article. As long as the patent covers the article that is the subject of the exclusion proceeding, and as long as the party seeking relief can show that it has a sufficiently substantial investment in the exploitation of the intellectual property to satisfy the domestic industry requirement of the statute, that party is entitled to seek relief under section 337.

When enacting the 1988 amendment to section 337, Congress recognized the development in the United States of industries that devoted substantial investment to the exploitation of patent rights through engineering, research and development, and licensing, but not entailing domestic production of the goods that were protected by those patents. Through subparagraph 337(a)(3)(C), Congress provided for the International Trade Commission to offer a remedy to those industries upon proof that imported goods infringed valid patent rights, and the Commission has consistently interpreted the statute to authorize it to do so. To the argument that Nokia makes—that the result reached by the Commission would convert the Commission from a trade forum into an intellectual property forum—Congress has already given its response, which is that section 337 protects American industries, including American industries that are built on the exploitation of intellectual property through engineering, research and development, or licensing.

# United States Court of Appeals
# for the Federal Circuit

---

**INTERDIGITAL COMMUNICATIONS, LLC AND
INTERDIGITAL TECHNOLOGY CORPORATION,**
*Appellants,*

**v.**

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

**AND**

**NOKIA INC. AND NOKIA CORPORATION,**
*Intervenors.*

---

2010-1093

---

Appeal from the United States International Trade Commission in Investigation No. 337-TA-613.

---

NEWMAN, Circuit Judge, dissenting from denial of petition for rehearing.

Nokia requests rehearing, and again raises the question of whether InterDigital has the statutory right to bring this exclusion action, for InterDigital does not manufacture the patented invention in the United States, and no domestic industry produces the items for which exclusion is sought. The license that InterDigital seeks to impose on Nokia, on

threat of exclusion of importation, is not a license to manufacture any patented product in the United States; it is a license to import products made in foreign countries. The panel majority errs in holding that Congress intended to authorize access to the ITC exclusion remedy in such circumstances. That is not the purpose of the "licensing" amendment to Section 337 of the Tariff Act.

The licensing amendment did not eliminate the domestic industry requirement for access to the ITC remedy of exclusion. Indeed, the amendment confirmed that requirement. The panel majority erred in holding that the domestic industry requirement is met by licensing the importation of foreign-made products. The purpose of the licensing amendment to Section 337 was to enlarge the benefit and incentive to domestic industry by giving licensors access to ITC exclusionary procedures; the purpose was not to eliminate the requirement of domestic manufacture of the licensed articles. The panel majority continues to err, in reinforcing its theory that

> Section 337(a)(3) makes clear that the required United States industry can be based on patent licensing alone; it does not require that the articles that are the objects of the licensing activities (i.e., the "articles protected by the patent") be made in this country.

*InterDigital Commcn's, LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1329 (Fed. Cir. 2012) (majority opinion).[1] To the

---

[1] The majority now argues that "a sufficiently substantial domestic licensing industry will need to license its technology to a manufacturer somewhere," but not necessarily in the United States. Rehearing Op. 14-15 n.4. This contrasts with the panel's previous holding in this case that a "domestic industry" can be based on licensing activity

contrary, the legislative record of Section 337(a)(3) does not "make clear," or suggest, or even hint, that "articles protected by the patent," Section 337(a)(2), need not be made in this country in order for the patentee to obtain exclusion of foreign-made infringing products.

The purpose of the 1988 amendments to Section 337 was to permit patentees that do not themselves manufacture their patented products, such as universities and others that perform research or engineering, to have access to the Section 337 remedy. The 1988 amendments did not remove the requirement that "articles protected by the patent" must be produced in the United States; the amendments were designed to enlarge the incentive for domestic production, not to eliminate it.

The panel majority insists that Congress intended to make the ITC remedy of exclusion available to exclude foreign manufactures in the absence of domestic production, although the patentee in this case does not want to exclude the foreign product, but only to obtain a fee for its importation. My colleagues hold that it is irrelevant that no domestic industry is producing, or planning to produce, the patented articles, directly or under license, stating that

---

alone. 690 F.3d at 1329. Both of the majority's inconsistent holdings are incorrect. Indeed, the majority's new position is unsupported by the record, for InterDigital does not assert that these patents are licensed to Nokia for use by industry in Finland (or any other country). As I discuss *post*, the legislative history shows no contemplation, much less ratification, of providing access to the ITC's remedy of exclusion based on licensing of foreign manufacture. The statute requires "an industry in the United States, relating to the articles protected by the patent [to] exist[] or [be] in the process of being established." 19 U.S.C. §1337(a)(2). The purpose is to protect United States industry, not as an incentive to industry in foreign countries.

Congress "clearly" intended to abandon the purpose of Section 337 to serve domestic production. However, that is the purpose of Section 337. The legislative record is clear that the "licensing" amendment to Section 337 was enacted to encourage and support domestic production of patented products. It is time for the court to correct its error, not to reinforce it.

I

THE "LICENSING" AMENDMENT

Section 337 was enacted in the Tariff Act of 1930, to provide an expedited and efficient remedy against foreign-made infringing products by authorizing exclusion of such products from importation, as an additional or alternative remedy for infringement, but with certain caveats. Thus the statute originally required that in order to obtain the remedy of exclusion there must not only be a domestic industry practicing the patent, but also that the domestic industry must be "efficiently and economically operated," and must be injured by the importation. The 1988 amendments facilitated access to exclusion by eliminating the need to prove injury and efficient and economic operation of the domestic industry, and extended the exclusion remedy to patentees such as universities and research institutions that do not themselves manufacture goods.

The legislative history of the 1988 amendments cannot be read as proposed by the panel majority. The Tariff Act of 1930, in its current codification at 19 U.S.C. §1337 as amended, declares unlawful:

* * *

§1337(a)(1)(B) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that—

    (i) infringe a valid and enforceable United States patent or a valid and enforceable United States copyright . . . ;

* * *

(a)(2)  Subparagraphs (B) [patent and copyright], (C) [trademark], (D) [mask work], and (E) [design] of paragraph (1) apply only if an industry in the United States, relating to the articles protected by the patent, copyright, trademark, mask work, or design concerned, exists or is in the process of being established.

(a)(3)  For purposes of paragraph (2), an industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned--

    (A)  significant investment in plant and equipment;
    (B) significant employment of labor or capital; or
    (C) substantial investment in its exploitation, including engineering, research and development, or licensing.

The 1988 amendments arose from an ITC copyright decision in 1986, *Certain Products With Gremlin Character Depictions*, Inv. No. 337-TA-201, USITC Pub. 1815 (March 1986) (Final Determination), 1986 ITC LEXIS 313. The complainant Warner Brothers sought exclusion of products that

infringed its copyrighted Gremlin characters. The ALJ held that the domestic industry requirement of Section 337 was met, stating that Warner Brothers "licensed 48 domestic companies to produce a wide variety of goods containing GREMLINS character depictions [including] hats, lunch boxes, painter caps, jerseys, posters, 'Colorforms,' playsets, toy cars, card games, patterns for costumes, blankets, baby sleepers, records, pajamas, and puffy stickers, to name just a few." *Gremlins*, Inv. No. 337-TA-201 (Sept. 12, 1985) (Initial Determination), 1985 WL 303620, at *10. The full Commission reversed, holding that "the licensing activities of Warner with respect to the 'Gremlins copyrights' do not constitute a domestic industry under section 337." 1986 ITC LEXIS 313, at *158.

Congressional hearings were held to consider this and other issues that had arisen concerning Section 337. The record shows general agreement among industry, government, and legislators, as they cooperated to adapt the ITC exclusion provision to circumstances such as in the *Gremlins* case, where the owner of the copyright was not itself a manufacturer of the products licensed to use the copyright. The legislative purpose was to assist United States industry in protecting against infringing foreign-made goods, by providing a ready remedy against importation, rather than obliging the owner of the property right to wait to act against infringing goods after they reach the marketplace.

House Judiciary Subcommittee Chairman Kastenmeier, the primary sponsor of the legislative changes, initiated extensive study and hearings. Reported at *Intellectual Property and Trade: Hearings Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary ("House Judiciary Hearings")*, 99th Cong. 551 (1986); 132 Cong. Rec. H1783 (Apr. 10, 1986), he stated that legislation was needed to

> modify the domestic industry requirement by allow-
> ing complaints to be filed by persons who have made
> a substantial investment in facilities or activities re-
> lating to the exploitation of a patent [or other intel-
> lectual property], including research and
> development, licensing, sales, and marketing. This
> adjustment will assure continued access to the ITC
> by entities, including universities, who have a sub-
> stantial stake in the United States.
>
> This change would also avoid the unfortunate re-
> sults which have occurred in some recent cases,
> such as *Gremlins*, where—because of pertinent leg-
> islative history explaining the current law—the ITC
> has denied relief notwithstanding the existence of a
> large service industry exploiting the intellectual
> property right within the United States. Finally,
> such a change will enable universities and small
> businesses who do not have the capital to actually
> make the good in the United States to still have ac-
> cess to the ITC forum for the protection of their
> rights.

*Id.*

Chairman Kastenmeier stated that his "modest" pro-
posal does not "delete the domestic industry requirement."
*Trade Reform Legislation: Hearings Before the Subcomm. on
Trade of the House Comm. on Ways and Means ("House
Ways and Means Hearings")*, 99th Cong. 818 (1986). He
objected to simply removing the domestic industry require-
ment from the statute:

> Without the "domestic industry" requirement, this
> access [to ITC exclusion] would not be predicated on
> any investment in the United States. This change

> cannot be said to be an attempt to protect American jobs, quite the contrary is true.

*Id.* at 824.  During the same hearings, Representative Carlos J. Moorhead explained why amendment to the existing statutory text was needed:

> The industry test . . . prevents universities and research institutions from using the ITC for enforcing their patents, copyrights and trademarks because they are not in business.

*Id.* at 849.  Representative Moorhead did not suggest that Section 337 had any purpose other than to support domestic manufacture.

ITC Chair Paula Stern stressed the role of intellectual property rights in production and in economic growth:

> I am concerned that the proposed legislation can be read to elevate the protection of intellectual property rights—regardless of whether they are ultimately commercially exploited—over other important public interest goals. After all, society benefits even more from the fruits of the inventor when intellectual property rights are exploited through the efforts and capital of the entrepreneur.  It is this production-related activity which in turn spawns economic growth.  Society does not benefit directly from protecting a particular invention unless that idea is ultimately exploited . . . .
>
> I therefore believe that to be consistent with the public-interest purpose of section 337, the domestic industry and injury standard should be maintained, and should continue to require more than mere

ownership of a U.S. intellectual property right . . . .
Universities are not domestic industries.

*House Judiciary Hearings* at 5-6, 69. Representative Moor-
head agreed, but pointed out the role of university inven-
tions in potential industrial activity:

> But the university really does not have a very good
> remedy anyplace at the present time . . . . [Courts]
> hear them, but there is so much time that passes
> before they actually get into court that the purpose
> of the invention and the profit has been reaped
> abroad and it is too late to do anything about it.

> What do you do about a new cancer treatment in the
> biotech area like interferon or something of that
> kind? There is no industry yet at this time, it is
> something that there will be a great industry.

*Id.* at 70.

As the legislative process progressed, the hearing re-
cords contain testimony and statements of representatives
of industry, government, the academic community, and
legislators. I present a sampling of testimony specific to the
proposal to provide licensors with access to ITC exclusionary
procedures; no witness disputed that Section 337 is in-
tended to support domestic manufacture, not imports of
foreign manufacture.

*Michael H. Stein, for Corning Glass Works and the
Semiconductor Industry Association, House Ways and
Means Hearings* at 655:

> [T]he requirement that a complainant establish that
> there is a U.S. industry exploiting the intellectual
> property should remain. The purpose of the ITC is

to adjudicate trade disputes between U.S. industries and those that seek to import. Moreover, the issuance of an exclusion order makes little sense if it does not protect an industry within U.S. borders.

*Richard C. Witte, Proctor & Gamble Co., testifying as Vice President of Intellectual Property Owners, Inc. (IPO)*, explained that including "licensing" could facilitate use of the patented technology:

Owners of patents in rapidly changing high-technology industries should not be denied relief against foreign competition if steps are being taken to establish an industry in the U.S. Some industries in the U.S. built on new technologies may never come into existence if patent owners cannot fend off free riders.

We believe if an intellectual property owner has made a significant investment in the United States, that should satisfy the industry requirement. Significant investments in research and development should qualify. It should be made clear also that universities and other intellectual property owners who license their rights to manufacturers are eligible to obtain relief.

*Intellectual Property Rights: Hearings Before the Subcomm. on Int'l Trade of the S. Finance Comm. ("Senate Hearings")*, 99th Cong. 193-94 (1986). IPO therefore supported access to ITC remedy for domestic organizations whose function it is to do research, and license the use of that research to manufacturing industries in the United States. *Id.* at 188.

Similar positions were presented on behalf of many technology-based corporations. *E.g.*, *Thomas D. Kiley, Vice President, Genentech, Inc.*:

Under current ITC jurisprudence, it is open whether relief is available to a patentee who does not himself manufacture and sell the goods involved. Under present law the rights of universities and individual inventors before the International Trade Commission are unresolved.

*House Judiciary Hearings* at 87.

*Roy H. Massengill, General Patent Counsel, Allied Signal, Inc.:*

We do not object to having some sort of business entity or a type of industry where there is an investment. Universities I think are a special case that would have to be an exception.

*Id.* at 91.

All witnesses stated that the purpose of extension of the Section 337 remedy to entities such as universities and research institutions is to accommodate their role as licensors to domestic industry—not to authorize ITC exclusion of foreign-made products when no domestic industry exists or is "in the process of being established." Section 337(a)(2). *Senator Frank Lautenberg*, a co-sponsor of the corresponding Senate bill, stated:

The current law throws up barriers that have blocked relief for a range of firms, from the New York inventor of fiber optic waveguide to a Tennessee maker of softballs, to the California movie studio that licenses the Gremlin character.

*House Ways and Means Hearings* at 572.

The panel majority states that Senator Lautenberg "explained that it was not appropriate to require production in the United States in order for section 337 to be available as a remedy." Rehearing Op. 9-10. That is incorrect. Senator Lautenberg stated that he sought to provide protection under Section 337 for "[r]esearch-based firms [that] are plowing millions of dollars into the development of new products and processes," and companies that spend hundreds of millions of dollars "to develop and bring a new pharmaceutical product to market" or create a "new family of semiconductor chips." 133 Cong. Rec. S9937 (July 15, 1987). Senator Lautenberg did not propose elimination of the domestic production requirement of Section 337; he stated that "[f]or those who make substantial investments in the creation of intellectual property and then license their creations, there should be a remedy," and that domestic industries should be protected from piracy. *Id.*

*U.S. Trade Representative Clayton Yeutter* presented the Administration position, that it should be made easier for domestic industry and universities to have access to the Section 337 remedy by eliminating the industry test of "efficient and economic operation":

> The Administration also supports elimination of the industry test provision of the current law, another source of needless uncertainty . . . . The industry test also prevents universities and research institutions from using the ITC for enforcing their patents, copyrights and trademarks because they are not in business.

*House Ways and Means Hearings* at 354.

Witnesses explored the trade policy aspects of Section 337. Professor Robert E. Hudec of the University of Minnesota Law School discussed the relation of the proposed changes in Section 337 to the GATT (General Agreement on Tariffs and Trade), stating his "views of what the GATT problems are with regard to the present section 337 and the proposed reforms." *House Judiciary Hearings* at 172-73.

Chairman Kastenmeier made clear that the purpose of the licensing amendment was to benefit entities "who have a substantial stake in the United States." *Id.* at 551. The final legislative reports of both Houses of Congress are explicit: H.R. Rep. No. 100-40 (*House Report*), at 157 (the amendments "encompass universities and other intellectual property owners who engage in extensive licensing of their rights to manufacturers."); S. Rep. No. 100-71 (*Senate Report*), at 129 (the amendments "encompass universities and other intellectual property owners who engage in extensive licensing of their rights to manufacturers.").

Other amendments deleted the requirements of establishing injury to the domestic industry, and that the industry must be shown to be efficiently and economically operated, as I discuss *post*. However, the requirement that there must be a domestic industry, in existence or in the process of being established, was not touched. After two years of hearings, deliberation, and interaction among the concerned communities, Section 337 was amended to these effects.

Despite this legislative record, the panel majority held that the legislative history "strongly support[s]" the view that the 1988 amendments eliminated the requirement of domestic production. *InterDigital*, 690 F.3d at 1329. The panel majority now repeats that error. However, there is no support for their statement that the legislation "made clear

that it would not be necessary for a complainant to prove that patent-protected goods were being produced in this country." Rehearing Op. 12. Domestic manufacture, actual or in the process of being established, is explicitly required in the present statute. No contrary position was "made clear" in the legislation.[2]

Section 337(a)(2) requires that there be "articles protected by the patent," that is, articles made or in preparation to be made in the United States. The amended statute authorizes a licensor to bring an ITC exclusion action, for the purpose of the amendment is to give a licensor access to the remedy of exclusion of foreign-made infringing products, as an alternative to district court litigation after importation of the infringing products.[3] The purpose is to protect the licensor's income and its licensees. The purpose is not to facilitate importation of foreign-made products.

---

[2]  The panel majority makes the statement that Chairman Kastenmeier "compromised" away the requirement that a domestic industry is practicing or intending to practice the patented invention. Rehearing Op. 12. The majority states that the legislators intended, by explicit compromise, to eliminate any domestic manufacture requirement. The legislative record contains no reference to such a compromise, no proposal for such a compromise, no suggestion that such a compromise was achieved, no explanation that Section 337 is no longer concerned with domestic manufacture as a ground for excluding foreign manufacture. No witness commented on such a far-reaching compromise. It would be remarkable indeed if it were made, silently, without comment or reportage – unknown until today.

[3]  A statutory amendment in 1994 renders it obligatory for a district court to stay a co-pending infringement action until the ITC proceeding is completed. 28 U.S.C. §1659.

The domestic industry requirement is satisfied only if "[t]he owner of the property right [is] actively engaged in steps leading to the exploitation of the intellectual property, including application engineering, design work, or other such activities." *Senate Report* at 130 ("Because this statute is not intended to protect holders of U.S. intellectual property who have only limited contact with the United States, the Committee does not want to see this language used as a loophole to the industry requirement."); *House Report* at 157 (same). Section 337 does not depart from the requirement that there be a domestic industry to produce the patented articles, whether under its own patents or by license.

The panel majority plucks out of context a statement that the amended statute "does not require actual production of the article in the United States if it can be demonstrated that substantial investment and activities of the type enumerated are taking place in the United States." *Senate Report* at 129; *House Report* at 157. The majority omits the ensuing sentence, that "[t]he definition could encompass universities and other intellectual property owners who engage in extensive licensing of their rights to manufacturers." *Senate Report* at 129; *House Report* at 157. The Reports state that when the licensor does not itself manufacture the patented articles, the licenses are "to manufacturers." Manufacture under a licensed United States patent is manufacture in the United States.

As I discuss in Part III, implementation of this "licensing" amendment became erratic in the ITC and in this court, as the terse statutory language led to imprecision of interpretation. At the time of consideration of these amendments the major issue was not the "licensing" aspect, which was uncontroversial, but the other proposals, particularly whether to eliminate the long-standing requirements that the domestic industry is injured by the importation, and is

efficiently and economically operated. I turn briefly to this aspect of the 1988 amendments.

## II

## "EFFICIENTLY AND ECONOMICALLY OPERATED" DOMESTIC INDUSTRY

Section 337 as enacted in 1930 contained the requirement that the complainant must establish both that the domestic industry is injured by the infringing imports, and that the domestic industry is efficiently and economically operated. The proposal to eliminate these requirements occasioned diverse views, as patent policy interacted with trade policy and competition policy. These aspects occasioned independent discussion, with somewhat less unanimity than for the licensing amendment. Following is a sampling of the hearing record:

*ITC Chair Paula Stern*: "The present efficient and economic operation requirement may enlarge the discovery record and the hearing record with concomitant additional costs to the parties and the Commission. It may also place large amounts of confidential information at risk. However, using our trade statutes . . . in a situation where the domestic industry is inefficient and will not be economically viable is a waste of resources." *House Judiciary Hearings* at 26. Chairman Stern proposed modifying, but not eliminating, the "efficiency" requirement for the domestic industry.

*Senator William V. Roth, Jr.*: "As I see it, the priority for us in the committee in this effort to amend section 337 is the injury issue. Right now the law requires that infringing imports threaten an efficient and economically operated domestic industry with 'destruction or substantial injury.' But why should an owner of an intellectual property right

like a patent have to demonstrate destruction or substantial injury if the patent is infringed?" *Senate Hearings* at 2.

*Senator Frank Lautenberg*: "The main problem is this: it isn't enough to prove piracy. One has to prove it hurts. One has to prove that imports would destroy or injure a U.S. industry . . . an industry that is efficient and economically operated." *Id.* at 38.

*Senator John C. Danforth*: "My own view is that—and I am a cosponsor of the bill—if counterfeited material is being shipped into the United States it should be very easy to get relief. I view that as really a per se type violation of fundamental standards of how we want to do business in this country, and that it should not be a lengthy process of trying to prove whether you are injured and whether your industry is operating efficiently and whether your industry is impacted." *Id.* at 128.

Representative Moorhead discussed the difficulty of proving injury:

> It is very, very difficult to prove damage to an industry where you have a great invention, one that is obviously going someplace, going to develop a great industry, where the industry has not been developed as yet, because there has not been time, and before that industry can get off the ground here, they are selling the same product from abroad.

*House Judiciary Hearings* at 69. Representative Moorhead stated: "Also an inventor would not have to prove that its industry is efficiently and economically operated. Some small high-technology firms may not have a chance to get started and to become economical before they are challenged by pirates. They are unable to seek relief before the ITC

just as universities and individual inventors are unable to seek relief before the ITC." *Id.* at 2.

*Harvey Bale, Assistant U.S. Trade Representative, for the Administration*: "[I]n our opinion the need to establish an efficiently and economically operating industry imposes a burden on U.S. intellectual property owners which makes it harder for them to enforce their rights . . . . The time, energy, and money of the patent owner, the respondent, and the Commission are expended to determine whether a real 'efficiently and economically operated' industry exists." *Id.* at 48.

*Thomas D. Kiley, Vice President, Genentech*: "The necessity of demonstrating injury to an efficient and economically operated industry . . . is a burden beyond those present in conventional patent actions. It is a burden not shared by process patent holders in many other countries . . . . And foreign industry will invariably be more efficiently and economically operated if it can forego the burden and expense of original research." *Id.* at 87.

*Roy H. Massengill, Allied Signal*: "I think that the requirements that industry establish injury through showing they have an efficient and economically operated industry is too burdensome on a patentee. Moreover, there are a lot of research projects as well as universities that cannot meet that requirement." *Id.* at 93.

*Michael H. Stein, Corning Glass and the Semiconductor Industry Association:* "Section 337 should also be amended to eliminate the requirement that a complainant prove that the U.S. industry is 'efficiently and economically operated.' This element is vague, highly subjective, and to its credit, the U.S. International Trade Commission has never denied relief on this basis. This element adds additional needless

cost to the already high price of section 337 relief, and subject[s] U.S. industries to extensive discovery by counsel for foreign respondents." *Id.* at 244. "The injury and efficient and economic operation requirements of section 337, designed for the antidumping context originally intended in the statute, make no sense in the intellectual property arena." *Id.* at 246. "For example, how does one establish that a new, emerging industry is efficiently and economically operated?" *Id.* at 251. "We are aware of little or no opposition to the removal of this requirement." *Id.* at 252.

*Richard C. Witte, for IPO*: "We support eliminating completely the requirement that the ITC must find the U.S. industry to be efficiently and economically operated. For example, it may be difficult for a newly established technology based industry to show that it is efficient." *Senate Hearings* at 187-88.

*William T. Archey, for the United States Chamber of Commerce*: "We support eliminating the requirement that the ITC must find the U.S. industry to be 'efficiently and economically operated' as a condition for relief in intellectual property cases particularly since it may be difficult for a newly established, technology-based industry to show that it is efficient." *Id.* at 247-48.

Representative Kastenmeier initially advocated modifying, but not eliminating, the "efficiently and economically operated" requirement: "Third, transfer the economically and efficiently operated criteria from being an element of the complainant's case to a public interest factor to be evaluated by the ITC only in determining whether to approve a remedy. This change alone should limit the real and potential discovery abuse which can occur under current law." *House Judiciary Hearings* at 551.

To the extent that there was any difference of opinion at the Hearings, it related to the requirements of showing injury and efficient and economical operation. Although the panel majority makes much of what they call "the compromise," they do not explain what was compromised. The statement on behalf of the Monsanto Company, cited by the panel majority to illustrate the purported "compromise," shows no proposal that the domestic industry requirement should be removed. Donald H. Swan, Vice President, Monsanto Co., testified:

> We believe that you should retain the requirement that U.S. industry be involved. That is, that the complainant has substantial investment in U.S. manufacturing, R&D, creative development or marketing development facilities. This would include universities and pure research facilities.

*Senate Hearings* at 175. However, Monsanto supported eliminating the requirement of proving injury and efficient and economical operation:

> We strongly support proposed improvements to Section 337 to make it more practical to bring cases in the ITC to exclude imports which infringe U.S. patents, trademarks, and copyrights. When this type of action is applied to an infringement case, as opposed to the more usual injurious import of goods, clearly issues such as whether the complainant is "efficiently and economically operated" or whether "injury" can be proven are irrelevant. Infringement is by definition an injury to intellectual property rights and whether the innovator's operation is efficiently run is meaningless in an intellectual property rights case, as opposed to a commodity manufacturing case.

*Id.* at 179-80.  My colleagues' statement that the legislators compromised away the domestic industry requirement is without foundation.

## III

### INCONSISTENT PRECEDENT

The panel majority states that "the Commission has consistently construed subparagraph (C)" so that licensing alone is deemed to be a domestic industry, with no need for domestic licensed manufacture.  Rehearing Op. 4.  That is incorrect, for the Commission has often held that licensing alone does not satisfy the domestic industry requirement, even as the Commission has also reached inconsistent holdings.

In *Certain Methods of Making Carbonated Candy Products*, Inv. No. 337-TA-292, USITC Pub. 2390 (June 1991), the Commission addressed the then-recently enacted Section 337(a)(3).  The complainants included the patent holder, its exclusive licensee, and "a partnership established to manufacture, sell, and distribute" the patented carbonated candy.  Comm. Op. at 1.  The complainants argued that their commercial production of carbonated candy practiced the "essential element" of the patent and therefore satisfied the domestic industry requirement.  In rejecting this argument, the Commission ruled that the statutory language "with respect to the articles protected by the patent" "reflects the Commission's long-standing practice of holding that a domestic industry does not exist if the complainant, or its licensees, is not exploiting the asserted patent." *Id.* at 34-35.  The Commission "adopt[ed] the ALJ's finding that the domestic industry does not practice" the asserted patent, *id.* at 31, and denied exclusion under Section 337.

It is suggested that *Certain Dynamic Sequential Gradient Compression Devices and Component Parts Thereof*, Inv. No. 337-TA-335, USITC Pub. 2575 (Nov. 1992), is an early example of the Commission's elimination of the domestic production requirement. Rehearing Op. 5. While the ALJ stated that "a complainant in a Section 337 investigation need not manufacture the product covered by the claims of the patent in order to establish that a domestic industry exists," the ALJ also stressed the need for "articles protected by the patent":

> Therefore, the activities set forth in [Section 337(a)(3)] may constitute a domestic industry only if they are sufficiently related to articles protected by the patent as to constitute an exploitation thereof.

Initial Determination at 59-61 (May 15, 1992). The ALJ held that the complainant's investments in research and development, engineering, and educational programs did not constitute a domestic industry. *Id.* at 61. Licensing was not discussed because the complainant had "not engaged in licensing under the [asserted] patent." *Id.* at 60 n.30.

In *Certain Integrated Circuit Telecommunication Chips and Products Containing Same, Including Dialing Apparatus*, Inv. No. 337-TA-337, USITC Pub. 2670 (Aug. 1993), the Commission rejected the argument "that to the extent that a domestic industry with respect to the [asserted] patents is based on complainant's licensing or research and development activities, the domestic industry requirement is satisfied even if it is found that complainant . . . do[es] not practice the [asserted] patents." Initial Determination, 1993 ITC LEXIS 859, at *87 n.87. The ALJ stated that "Section 337(a)(2) requires that the domestic industry relate to the articles protected by the patent," and that the requirement of domestic production "reflects the Commission's long-

standing practice of holding that a domestic industry does not exist if the complainant, or its licensees, is not exploiting the asserted patent." *Id.* The Commission adopted the ALJ's "thorough and well reasoned" analysis. 1993 ITC LEXIS 854, at *25-26 n.2.

The panel majority states that some of these decisions are "inapposite." Rehearing Op. 5. However, they all apply and interpret Section 337(a)(3). In *Dialing Apparatus* the ALJ, approved by the full Commission, stated:

> [T]he administrative law judge has found no authority for the conclusion that a mere license under a patent, where the licensee has not fabricated any product which a complainant contends embodies the invention described in said patent, is adequate to establish a domestic industry.

1992 WL 811431, at *11-12 n.25. This statement is directly apposite.

However, the Commission has been inconsistent. A conflicting Commission decision is *Certain Digital Satellite System (DSS) Receivers and Components Thereof*, Inv. No. 337-TA-392 (Oct. 20, 1997). The ALJ found that the complainant's licensing activities were sufficient to satisfy the domestic industry requirement because the complainant (1) employed five people to "identify[], approach[], and negotiat[e] with prospective licensees," and (2) had "incurred substantial expenditures relating to litigation of its patent rights." Initial Determination, 1997 WL 696255, at *8. The ALJ stated that "the statute does not require a complainant to manufacture the patented product nor does it require that a complainant show that a product covered by the [asserted] patent is made by complainant's licensees." *Id.*, at *8. The full Commission did not discuss this aspect of the

Initial Determination. *Certain DSS Receivers*, Notice (May 13, 1999) (vacating only the ALJ's invalidity rulings).

The panel majority states that Section 337 requires the investment in licensing to be "substantial" to constitute a domestic industry, and therefore that there is no "concern that the statute will be used to grant a remedy to any domestic patent owner, no matter what the scale of its activities in exploiting the patent." Rehearing Op. 7 n.2. For this proposition, the majority cites *Certain Stringed Musical Instruments and Components Thereof*, Inv. No. 337-TA-586 (May 16, 2008) (Final Determination). But this case merely illustrates the uncertainty engendered by the majority's inconsistent statutory interpretation. In *Certain Stringed Musical Instruments* the Commission denied an independent inventor's request for Section 337 remedy, although he had spent thousands of dollars to manufacture five different prototypes of his patented tuning device and devoted many years attempting to license his patented tuning technology for domestic manufacture. Comm. Op. at 9-10, 25-27. The Commission held that the inventor had not shown "substantial investment," although the context showed that the inventor had persistently sought licensees.

A recent ITC decision concerned whether the combination of licensing and litigation expenses could meet the domestic industry requirement, and held that it might, depending on the particular facts. In *Certain Coaxial Cable Connectors*, Inv. No. 337-TA-650, 2011 WL 7463395 (Apr. 2010) the ITC stated that "Congress contemplated that the requirement would cover small companies, such as biotech startups, that license their patents in order to generate sufficient capital to manufacture a product in the future." *Id.*, at *38. The Commission quoted the statement of Senator Lautenberg, who had explained:

> For those who make substantial investments in re-
> search, there should be a remedy.  For those who
> make substantial investments in the creation of in-
> tellectual property and then license creations, there
> should be a remedy. Let me give one example,
> there's a start-up biotech firm in my state.  Its
> product is its patents. *It hasn't reached the stage of
> manufacture. It doesn't have the money.  But it will
> reach that point, by licensing its patents to others.*
> Should we deny that firm the right to exclude the
> work of pirates?  Our legislation would say no.  A
> party could get relief if it has made significant in-
> vestment in R & D, engineering, or licensing.

*Id.* (quoting 132 Cong. Rec. H1782 (Apr. 10, 1986)) (empha-
ses in original).  The Commission stated that "licensing" in
Section 337 covers not only licensing to "bring a patented
technology to market," but also activities that "take advan-
tage of the patent, *i.e.*, solely derive revenue" from the
patent. *Id.*, at *39.  On further determination, the ALJ held
that the domestic industry requirement had not been met.
*Id.*, at *5 (July 12, 2010) (Commission notice declining to
review ALJ's determination of no domestic industry).  This
court affirmed, holding in *John Mezzalingua Associates v.
International Trade Commission*, 660 F.3d 1322 (Fed. Cir.
2011), that the patentee's investment in licensing and
enforcement activities did not satisfy §1337(a)(3)(C).

In its brief on the *Mezzalingua* appeal to the Federal
Circuit, the Commission, responding to amici's argument
that only "productive" licensing should be considered rele-
vant to the establishment of a domestic industry, stated
that "there is no evidence that Congress considered . . .
NPEs [Non Practicing Entities] when it amended the Com-
mission's statute in 1988 . . . .  Indeed, the emergence of
NPEs in the last 15 years is too recent for Congress to have

considered when it amended the Commission's statute over twenty years ago." Commission Brief at 59-60 (Mar. 21, 2011). The Commission stated that "the legislative history and the design of the statutory scheme indicates that Congress intended section 337 to cover 'licensing' that encourages the productive use of the patented technology." *Id.* at 57. This court agreed, stating that "it is clear that Congress had no intention of disposing of the domestic industry requirement altogether." *Mezzalingua*, 660 F.3d at 1327. The panel majority's current ruling in *InterDigital* contradicts our own precedent.

A recent decision cited by my colleagues to show the Commission's "consistency" actually shows inconsistency. *Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-694, USITC Pub. 4292 (Aug. 8, 2011). The panel majority states that the Commission holds that investment in licensing alone may satisfy the domestic industry requirement. Rehearing Op. 4. The panel majority does not mention the Commission's statement that the purpose of the licensing amendment is to benefit patentees that license their patents "to manufacturers" or for "production-related activities":

> Section 337(a)(3)(C) was added to benefit domestic entities with limited resources like universities and start-up companies that license their inventions to manufacturers, as well as large entities that produce intellectual property through design and research and development activities in the United States, but outsource production-related activities through licensing.

Comm. Op. at 13 n.9. The Commission "reverse[d] the ALJ's finding that a domestic industry exists." *Id.* at 25.

Yet another recent ITC ruling is consistent with the requirement for domestic manufacture by license. In *Certain Integrated Circuits, Chipsets, & Products*, Inv. No. 337-TA-786, 2012 WL 3610787 (July 12, 2012) (Initial Determination), the ALJ had stated that "where a complainant is relying on licensing activities, the domestic industry determination does not require a separate technical prong analysis and the complainant need not show that it or one of its licensees practices the patents-in-suit." *Id.*, at *79. However, the ALJ also held that the investment in licensing was not "substantial" within the meaning of Section 337. *Id.*, at *87. On October 10, 2012, the Commission affirmed,[4] denying access to Section 337 exclusion.

It is plainly inaccurate to state that the Commission has "consistently" held that licensing alone satisfies the domestic industry requirement. Rehearing Op. 4. The conflicting rulings of the Commission itself underscore the need for resolution. And the *InterDigital* court's interpretation of Section 337 conflicts with the weight of this court's precedents, which require domestic production, or preparation to produce, articles protected by the patent. *See Crocs, Inc. v. Int'l Trade Comm'n*, 598 F.3d 1294, 1306-07 (Fed. Cir. 2010) (domestic industry requires "the industry [to] produce[] articles covered by the asserted claims."); *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1359 (Fed. Cir. 2007) (there must be a "domestic product" to satisfy the domestic industry requirement); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1375 (Fed. Cir. 2003) (considering whether the "industry relates to the protected articles."). The panel majority's statutory interpretation is a distortion of Section 337. *See InterDigital*, 690 F.3d at 1330 (holding that Inter-

---

[4]    No appeal has been filed as of this date.

Digital satisfies §337 because a domestic industry may consist "purely of licensing activities.").[5]

The burgeoning inconsistencies reinforce the need for resolution. At a congressional hearing in July 2012 witnesses pointed out that the ITC forum is often used not to protect domestic manufactures, but to facilitate importation of foreign manufactures. *See International Trade Commission and Patent Disputes: Hearings Before the Subcomm. on Intellectual Property, Competition and the Internet of the House Comm. on the Judiciary ("2012 Hearings")* (July 18, 2012). Neal A. Rubin, Vice President of Cisco Systems, testified that:

> patent assertion entities often rely upon the domestic activities of their unwilling licensees [to satisfy the domestic industry requirement] . . . . But this

---

[5] InterDigital reports that "substantially all of [its] revenue was derived from a limited number of licensees based outside of the United States, primarily in Asia." InterDigital, Inc., Annual Report (Form 10-K), at 21 (Feb. 27, 2012). The majority now states that "[t]he record also reveals substantial investment by InterDigital in the research and development that led to the patents in suit." Rehearing Op. 6. This is inaccurate. While the ALJ made a general statement that InterDigital has been involved in research and development of wireless technology since 1993, InterDigital argued that it "satisfies the domestic industry requirement based on its licensing activities alone." InterDigital did not provide evidence of research and development related to the patents in suit, and the record describes no relationship between research and development and licensing of the patents in suit. The only relationship asserted in this case is that the imported items, manufactured abroad by foreign industry, infringe United States patents. The licensing of foreign imports—whether by research institutions or universities—does not satisfy Section 337's domestic industry requirement.

statutory language, added by Congress in 1988, should not apply to the 'revenue-driven licensing' model.

*2012 Hearings* (statement of Neal A. Rubin).

At the same hearings, David B. Kelley, IP Counsel of Ford Global Technologies, testified that the purpose of the licensing amendment was to help American jobs and production:

> Licensing is permitted in the domestic industry test to allow innovators who don't make products, like universities, to use Section 337 . . . . This helps create American jobs in product development and manufacturing. On the other hand, [patent assertion entities] obtain and license their patents after a product has come to market, and seek to share in the value already created by others . . . . While a PAE may have a claim in district court, it should have no place in the ITC, which is intended to protect U.S. industries and jobs, not to allocate existing value among claimants by awarding damages.

*Id.* (statement of David B. Kelley).

We offer no view on the role of non-practicing entities in innovative advance, taking note of the complex positions on all sides. The issue before the court is simpler, for it relates solely to the purpose and application of Section 337, whether the licensor is a research establishment such as InterDigital, or any other licensing patent owner. The larger policy aspects are properly before the legislators. It is the judicial obligation to understand the law, to appreciate its purposes as enacted, and to apply the law correctly, in implementation of the legislation:

> The purpose of the Commission is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.

*House Report* at 157.

> The ITC is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.

*Senate Report* at 129.

My colleagues depart from the statutory text and purpose, in holding that the statutory requirement of domestic industry does not require domestic manufacture. Rehearing Op. 14 n.4. The statute says, twice, that there must be "articles protected by the patent," §1337(a)(2), (a)(3), whether produced by the patentee, or under license from the patentee. The domestic industry requirement is not met by foreign manufactures. That is the issue requiring judicial attention. From the panel's denial of the petition for rehearing, I respectfully dissent.