Opinion for the court filed by Circuit Judge BRYSON. Dissenting-in-part opinion filed by Circuit Judge REYNA.
BRYSON, Circuit Judge.
The appellant, which we refer to as PPC, challenges a determination by the International Trade Commission that PPC failed to prove that the importation of certain coaxial cable connectors violated section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337. The Commission ruled that PPC failed to satisfy one of the elements of a violation of section 337 — the so-called “domestic industry” requirement. We affirm.
I
PPC manufactures cable connectors that are used to connect coaxial cables to electronic devices, such as cable television receivers. PPC filed a complaint with the Commission asserting that the importation, sale for importation, and sale after importation of certain coaxial cable connectors infringed four of PPC’s patents and therefore violated section 337. Of the four PPC patents, two are design patents and two are utility patents. This case involves one of the design patents, U.S. Patent No. D440,539 (“the '539 design patent”). That patent issued in 2001 and describes an ornamental design for a coaxial cable connector. The '539 design patent is a continuation of U.S. Patent Application No. 08/910,509 (“the '509 application”). One of the two utility patents, U.S. Patent No. 6,559,194 (“the '194 utility patent”), is also a continuation of the '509 application.
Section 337 makes unlawful the importation of articles that infringe a valid and enforceable United States patent, but only if a domestic industry “relating to the articles protected by the patent ... exists or is in the process of being established.” 19 U.S.C. § 1337(a)(2). The complainant can satisfy the domestic industry requirement in one of three ways prescribed by 19 U.S.C. § 1337(a)(3), which provides:
[A]n industry in the United States shall be considered to exist if there is in the United States, with respect to the articles protected by the patent, copyright, trademark, mask work, or design concerned—
(A) significant investment in plant and equipment;
(B) significant employment of labor or capital; or
(C) substantial investment in its exploitation, including engineering, research and development, or licensing.
In contending that it established the existence of a domestic industry relating to the '539 design patent, PPC relies on sub-paragraph (C). The issue in this case is whether expenses PPC incurred in assert *1325 ing and defending the validity of that patent constituted a “substantial investment in exploitation” of the '539 design patent through licensing.
PPC has granted only one license for the '539 design patent. That license was executed in early 2004 between PPC and Arris International, Inc. (formerly Antee Corporation), at the conclusion of years of litigation involving the two parties and Arris’s distributor, International Communications Manufacturing, Inc. (“ICM”). PPC contends that money it spent during the years of litigation leading up to the execution of the 2004 license should be treated as an investment in licensing.
In presenting that argument, PPC relies principally on a 2001 lawsuit alleging infringement of the '539 design patent that PPC brought against Arris in the Middle District of Florida (“the Florida action”). In 2002, a jury found the '539 design patent valid and infringed, and it awarded PPC $1.35 million in damages. The court granted PPC’s request for injunctive relief. Also in 2001, PPC sued ICM in the District of Colorado, again alleging infringement of the '539 design patent (“the Colorado action”). Finally, in 2003, PPC sued Arris in the Western District of Wisconsin, asserting only the '194 utility patent (“the Wisconsin action”). A jury in that case found the '194 utility patent valid and infringed. In 2004, following judgment in the Florida and Wisconsin actions, and before the Colorado action went to judgment, the parties entered into a settlement that included a license agreement. The agreement permitted Arris to practice all the patents that claim priority to the '509 application, one of which is the '539 design patent.
Based on the evidence of PPC’s expenditures in that series of lawsuits, an International Trade Commission administrative law judge found that PPC had satisfied the domestic industry requirement by establishing a “substantial investment in [the] exploitation” of the design patent by licensing. The administrative law judge ruled that at least some part of the legal expenses that PPC had incurred in enforcing the '539 design patent in the Florida action should be treated as an investment in licensing, because a portion of PPC’s expenses were likely directed to settlement and licensing negotiations. The administrative law judge did not address the Colorado or the Wisconsin lawsuits. He also rejected PPC’s argument that it had made a substantial investment in research and development related to the EX connector, a cable connector that PPC manufactures and distributes. As to that issue, the administrative law judge ruled that PPC had abandoned that argument and that, in any event, the argument was without merit because the EX connector was not covered by the design claimed in the '539 design patent.
The Commission reviewed the initial determination and reversed the administrative law judge’s ruling that PPC had established a domestic market. The Commission noted that the term “licensing” in section 1337(a)(3)(C) encompasses not only “pre-litigation” licenses that are intended to spur production of the patented article in the first instance, but also licenses that are issued after litigation and capture royalties from existing production. The Commission acknowledged that in some circumstances enforcement-related litigation expenses may support a finding that a domestic licensing industry exists. In this case, however, the Commission found that PPC had not met its burden to show that its litigation expenses relating to the '539 design patent were related to licensing.
The Commission ruled that to permit litigation costs not shown to be licensing- *1326 related to satisfy the domestic industry-requirement would effectively render the domestic industry requirement a nullity for patentees who choose to enforce their patent rights in the district courts. The consequence of so doing, the Commission stated, would be to dilute the Commission’s role as a forum for resolving trade disputes.
The Commission explained that in a case such as this one, deciding whether particular litigation expenses were related to licensing and whether those expenditures were “substantial” is a fact-intensive inquiry that depends on factors such as the nature of the industry and the size of the complaining party. That inquiry would also require the fact-finder to determine whether the incurred expenses “serve to encourage practical applications of the invention or bring the patented technology to the market.” The Commission remanded the case to give PPC an opportunity to show what portions of its enforcement-related expenses were related to licensing and to demonstrate that its investment in licensing was substantial.
On remand, the administrative law judge ruled that PPC had not sufficiently tied its litigation costs to licensing and that any investment that PPC had made in licensing was not substantial. While acknowledging that the issue was “a close one,” the administrative law judge based his ruling on findings that PPC had received only one license, of which only a part related to the '589 design patent, that PPC had no established licensing program, and that it had made no other efforts to procure licenses for the '589 design patent. The Commission adopted the administrative law judge’s remand opinion without modification, and that order became final.
II
Before turning to the merits of PPC’s legal argument, we address the Commission’s argument that PPC does not have standing to appeal. The Commission argues that because the only imported product that was found to infringe the '539 design patent, the Fei Yu Model No. 43 connector, was also found to infringe the '194 utility patent, PPC has suffered no injury from the Commission’s decision and therefore lacks standing to appeal.
The Commission relies on our opinion in Yingbiiu-Nature (Guangdong) Wood Industry Co. v. International Trade Commission, 535 F.3d 1322 (Fed.Cir.2008), in which we held certain claims on appeal to be moot. In Yingbin, the Commission found that the respondent had imported a flooring product that infringed two groups of claims in the complainant’s patents, the “snap action” claims and the “lower lip” claims, each of which related to the joint between adjacent planks. Finding all other statutory requirements satisfied, the Commission entered a general exclusion order with respect to both groups of claims. The respondent appealed as to the “lower lip” claims, but not as to the “snap action” claims. We noted that because both groups of claims expired on the same day, the respondent would be in the same position regardless of how we ruled on the “lower lip” claims, so we held that the appeal as to those claims was moot. The respondent’s real concern, we explained, was that the finding of infringement as to the “lower lip” claims might interfere with the respondent’s subsequent efforts to redesign its product to avoid infringement. We held those concerns about the possible future effects of the Commission’s ruling as to the “lower lip” claims to be too hypothetical to confer standing on the respondent to press an appeal that would have no immediate practical effect.
PPC is in a different position. It is true that the only product that the Commission *1327 found to infringe the '539 design patent was also found to infringe the '194 utility patent. But PPC’s concerns are not related to possible future effects of the Commission’s decision, as was the case for the appellant in Yingbin. PPC has sought a general exclusion order relating to the '539 design patent. The fact that a particular model of connectors — the Fei Ye Model No. 43 connectors — will be excluded regardless of the outcome of this appeal does not moot PPC’s interest in obtaining the much broader relief that would be provided by a general exclusion order, which would cover all products deemed to infringe the '539 design patent. A favorable judicial decision could therefore significantly enhance PPC’s legal rights with respect to imported connectors.[1]
Ill
The question whether a complainant has satisfied the domestic industry requirement typically presents issues of both law and fact, but PPC’s appeal raises only factual issues relating to the link between various litigation expenditures and licensing. In reviewing the Commission’s factual findings as to whether particular expenses were related to licensing and whether those expenses, when viewed in the aggregate, were “substantial,” we apply the “substantial evidence” test. See Finnigan Corp. v. Int’l Trade Comm’n, 180 F.3d 1354, 1361-62 (Fed.Cir.1999); cf. Akzo N.V. v. Int’l Trade Comm’n, 808 F.2d 1471, 1486-87 (Fed.Cir.1986) (holding that the former requirement to prove an injury to the domestic industry, which was “wed[ded] to the particular facts of each case” and was “precisely the type of question which Congress has committed to the expertise of the Commission,” was subject to substantial evidence review).
A
The domestic industry requirement appears in the original Tariff Act of 1930. The original Act, however, did not describe how a complainant could go about establishing the existence of a domestic industry. The original Act also required the complainant to show that the unfair method of competition at issue caused injury to the domestic industry and that the industry was efficiently run. In 1988, Congress disposed of the last two requirements and added what is now 19 U.S.C. § 1337(a)(3), which provides three different ways that a complainant can satisfy the domestic industry requirement. Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418, § 1342, 102 Stat. 1107, 1213.
The reports accompanying both the House and Senate versions of the 1988 amendment state that the first two ways of showing the existence of a domestic industry — by showing a significant investment in manufacturing facilities or a significant employment of labor or capital — were already being considered by the Commission. S.Rep. No. 100-71, at 129 (1987); H.R.Rep. No. 100-40, at 157 (1987). But Congress, believing the Commission’s application of the domestic industry requirement had been too rigid, liberalized the domestic industry requirement by allowing that requirement to be satisfied by proof of non-manufacturing activity, such as licensing and research. H.R.Rep. No. 100-40, at 157. Nonetheless, it is clear that Congress had no intention of disposing of the domestic industry requirement altogether; Congress recognized that the *1328 Commission is fundamentally a trade forum, not an intellectual property forum, and that only those intellectual property owners who are “actively engaged in steps leading to the exploitation of the intellectual property” should have access to the Commission. Id. (“The purpose of the Commission is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States retains that essential nexus.”).
The statute does not specify whether litigation expenses incurred in enforcing a patent may later be used as evidence that the required domestic industry requirement exists. In light of the purpose underlying the 1988 amendment to section 337, the Commission reasonably concluded that expenses associated with ordinary patent litigation should not automatically be considered a “substantial investment in ... licensing,” even if the lawsuit happens to culminate in a license. To support its conclusion, the Commission pointed out that “[ajllowing patent infringement litigation activities alone to constitute a domestic industry would place the bar for establishing a domestic industry so low as to effectively render it meaningless.”
We agree with the Commission that expenditures on patent litigation do not automatically constitute evidence of the existence of an industry in the United States established by substantial investment in the exploitation of a patent. We therefore disagree with the dissent’s per se rule that “patent infringement litigation is an investment in the exploitation of a patent” within the meaning of section 337(a)(3)(C). Indeed, even PPC does not challenge the requirement that it demonstrate a nexus between its litigation expenses and licensing. Instead, PPC contends that, based on its showing before the administrative law judge, it satisfied that requirement. The administrative law judge, however, disagreed and found that PPC failed to show that its litigation expenses reflected a significant investment in licensing. With respect to the Florida action, the administrative judge noted that there was no evidence that PPC had offered to license the patent to Arris before commencing litigation, no evidence that PPC had sent a cease and desist letter mentioning the possibility of a settlement, and no evidence that PPC had conducted either settlement or licensing negotiations during the lawsuit itself.
PPC argues that the administrative law judge erred in finding that it had not engaged in pre-litigation licensing efforts. In support of that contention, however, PPC merely points to vague testimony by one of its executives to the effect that PPC made efforts to settle the case. That evidence does not undermine the administrative law judge’s finding that PPC failed to show that it sought to license the '539 design patent to Arris before commencing the Florida action and thus that it failed to show that the litigation expenses in that case were related to licensing. The administrative law judge was likewise entitled to disregard the statement by PPC’s witness that members of the industry are generally reluctant to accept a license to a design patent and that PPC therefore viewed litigation as a necessary precursor to licensing the '539 design patent. Regardless of the state of mind of competitors in the connector industry, which may have made prelitigation licensing more difficult, the question before the administrative law judge was whether PPC made a substantial investment in licensing, and the administrative judge reasonably concluded that PPC failed to show that it did.
*1329 PPC sought and received a permanent injunction in the Florida case, and that injunction remained in place for nearly two years until PPC licensed the '589 design patent to Arris in 2004. As the Commission recognized, that delay suggests that PPC’s purpose in litigating was not to obtain a license but, rather, was to stop Arris from manufacturing infringing connectors. The fact that litigation adversaries eventually enter into a license agreement does not, as PPC suggests, mean that all of the prior litigation expenses must be attributed to the licensing effort. Contrary to PPC’s suggestion, the Commission did not rule that a request for or receipt of injunctive relief will always bar a patentee from later seeking to establish the existence of a domestic industry through an investment in licensing. It merely ruled that the form of relief requested is one factor that could be considered.
The administrative law judge was entitled to conclude that the Florida action expenses should not be credited as expenses related to licensing. The record evidence on prelitigation communication regarding licensing is thin at best; PPC sought an injunction and allowed that injunction to remain in place for nearly two years, and it was not until after the Wisconsin action, which involved a different patent, that PPC granted a license to Arris. For similar reasons, the administrative law judge concluded that PPC had not shown that the expenses it incurred during the Colorado action were directed to licensing the '539 patent, and for similar reasons, we will not disturb that finding.
The Wisconsin action is fundamentally different from either the Colorado action or the Florida action because it involved only the '194 utility patent. The administrative law judge ruled that in PPC’s situation, expenses associated with the enforcement of a different patent should not be credited as an investment in licensing the '539 design patent. PPC argues that the Wisconsin jury verdict was necessary to force Arris to sign a license and that the administrative law judge should have credited more of PPC’s expenses in that lawsuit toward its investment in licensing the '539 design patent. We disagree. Although the license agreement was executed after the verdict in the Wisconsin case, it does not follow that PPC’s actions in the Wisconsin case were directed toward licensing the '539 design patent. In any event, the administrative law judge did not disregard the expenses of the Wisconsin litigation. He explained that once settlement and licensing negotiations began, the three actions became inextricably linked and that it made sense to consider the settlement and licensing negotiations related to all three cases in deciding whether PPC had made a substantial investment in licensing. The administrative law judge therefore examined PPC’s legal bills in all three cases and credited entries that had a work description related to “licensing” or “settlement” toward PPC’s investment in licensing.
PPC argues that on remand the administrative law judge failed to follow the Commission’s directive that “PPC’s litigation activities and costs, including any relevant costs associated with conducting settlement negotiations and then drafting and negotiating the license, may be related to licensing.” Because that directive uses permissive language, such as “including” and “may,” PPC argues that the administrative law judge could have credited other expenses that PPC generated during litigation and was not limited to those costs “associated with conducting license negotiations and preparing the license.” The Commission directed the administrative law judge to decide which of PPC’s many *1330 expenses were truly related to licensing of the '539 patent and which were not, and it suggested a flexible framework by which the administrative law judge could make that decision. In so doing, the administrative law judge reasonably relied on attorney work descriptions as he identified which expenses related to PPC’s litigation activities and which related to its investment in the domestic industry through licensing.
Although the administrative law judge found that PPC had, in fact, incurred some legal expenses related to the negotiation and drafting of the licensing agreement and therefore had made at least some investment with respect to licensing of the '589 design patent, he found that the investment was not substantial. He acknowledged PPC’s argument that the 2004 agreement was not reached until after PPC had filed several lawsuits against Arris and ICM on several different patents. PPC continues to press that argument on appeal and states that its expenses are sufficient to establish a significant investment in licensing. But because those cases had multiple objectives and were not all based on the '539 design patent, the administrative law judge reasonably concluded that it would be inappropriate to treat most of the incurred legal fees as an investment in licensing of the '539 design patent. We decline to disturb that ruling.
Finally, the administrative law judge pointed out that PPC had no formal licensing program and that there was no evidence it had offered to license the patent to any party other than its litigation opponents. To be sure, there is no rule that a single license — such as an exclusive license — cannot satisfy the domestic industry requirement based on a substantial investment in licensing. But the administrative law judge was entitled to view the absence of other licenses issued or negotiated for the '539 design patent as one factor supporting his conclusion that PPC’s expenditures related to licensing were not substantial. Based on the administrative law judge’s thorough review of the pertinent evidence, adopted in full by the Commission, we conclude that the Commission’s conclusion as to the licensing issue is supported by substantial evidence.
B
PPC also argues that the Commission should have credited at least a portion of the salary that PPC paid to the named inventor on the '539 design patent as an investment in “engineering, research and development,” together with PPC’s investment in the equipment and facilities that the inventor used as he developed the patented design. Although the administrative law judge had credited the inventor’s salary as an investment in research and development in the initial decision, the Commission disagreed. The Commission noted that the evidence that PPC introduced as to its investment in research and development related generally to the '509 application and the '194 utility patent in addition to the '539 design patent. The Commission found that PPC had presented no evidence of any investment in research and development that related specifically to the '539 design patent, nor did it offer any allocation of its investment to that patent. In the absence of any such evidence, the Commission concluded that the most reasonable inference was that the resources that PPC invested in the inventor should be attributed nearly entirely to the “development of the structural and functional design of the connector embodied in the '509 utility application and the '194 utility patent,” rather than to the development of the ornamental design embodied in the '539 design patent. Accordingly, the Commission concluded that any *1331 time and resources spent by PPC in researching or developing the ornamental design of the '539 design patent were minimal and insufficient to constitute the “substantial” investment required by section 337(a)(3)(C).
PPC acknowledges that it had the burden of proof on that issue. It had the opportunity to identify how much of its investment in research and development related to the design protected by the '539 design patent, as opposed to the '509 family more generally, and it failed to do so. The dissent’s contention that “there are no facts in the record before us sufficient to support the ITC’s conclusion that time and resources spent by PPC in researching or developing the ornamental design of the '539 patent are ‘minimal’ ” ignores that the Commission based its ruling on PPC’s failure to offer evidence sufficient to satisfy its burden of proof on that issue. There is no error in the Commission’s conclusion that PPC failed to carry its burden, nor is there any reason to remand for further findings on that issue, as suggested by the dissent.
AFFIRMED

. PPC acknowledged before the Commission that in its experience connectors that infringed the '539 design patent also infringed the '194 utility patent, but it did not suggest that cable connectors having the ornamental design of the '539 design patent would necessarily have the cable-locking mechanism claimed in the '194 utility patent.