Opinion for the court filed by Circuit Judge BRYSON. Dissenting opinion filed by Circuit Judge NEWMAN.
ON PETITION FOR REHEARING
BRYSON, Circuit Judge.
Intervenors Nokia Inc. and Nokia Corporation (collectively, “Nokia”) have petitioned for rehearing on one of the issues presented in this case: whether In-terDigital’s patent licensing activities satisfied the “domestic industry” requirement of section 337 of the Tariff Act of 1930, 19 U.S.C. §§ 1337(a)(2) and 1337(a)(3). Because Nokia has made a much more detailed argument with respect to that issue on rehearing than it did in its brief on the merits, a response to Nokia’s expanded submission is appropriate.
1. In its textual argument, Nokia focuses on the phrases “relating to the articles protected by the patent” and “with respect to the articles protected by the patent” in paragraphs 337(a)(2) and 337(a)(3). Paragraph 337(a)(2) provides that the bar to importation of infringing goods established by section 337 applies “only if an industry in the United States, relating to the articles protected by the patent ... exists or is in the process of being established.” Paragraph 337(a)(3) then states that an industry in the United States “shall be considered to exist if there is in the United States, with respect to the articles protected by the patent” significant investment in plant or equipment, significant employment of labor or capital, or “substantial investment in its exploitation, including engineering, research and development, or licensing.” The parties agree that the word “its” in the last clause of paragraph 337(a)(3) refers to the intellectual property at issue.
Nokia argues that the International Trade Commission and this court have not properly construed the phrases “relating to the articles protected by the patent” and “with respect to the articles protected by the patent” that appear in those two subsections. The Commission and the court construed those phrases to define the subject matter that is within the statute’s protection. With respect to subpara-graph (A) of paragraph 337(a)(3), the “significant investment in plant or equipment” that is required to show the existence of a domestic industry must exist “with respect to the articles protected by the patent” in question. That requirement will typically be met if the investment in plant and equipment is directed at production of articles protected by the patent. Similarly, with respect to subparagraph (B) of paragraph 337(a)(3), the “significant employment of labor or capital” that is required to show the existence of a domestic industry must exist “with respect to the articles protected by the patent.” That requirement will likewise typically be met by a showing that significant labor or capital is being expended in the production of articles protected by the patent. Applying the same analysis to subparagraph (C) of paragraph 337(a)(3) produces a parallel result that is consistent with the Commission’s and this court’s statutory construction: The “substantial investment in [the patent’s] exploitation, including engineering, research and development, or licensing” must be “with respect to the articles protected by the patent,” which means that the engineering, ' research and development, or licensing activities must pertain to products that are covered by the patent *1298 that is being asserted. Thus, just as the “plant or equipment” referred to in sub-paragraph (A) must exist with respect to articles protected by the patent, such as by producing protected goods, the research and development or licensing activities referred to in subparagraph (C) must also exist with respect to articles protected by the patent, such as by licensing protected products. This accords with the common description of the domestic industry requirement as having two “prongs”: the “economic prong,” which requires that there be an industry in the United States, and the “technical prong,” which requires that the industry relate to articles protected by the patent. See Certain Stringed Musical Instruments and Components Thereof (“Stringed Musical Instruments”), Inv. No. 337-TA-586, USITC Pub. 4120, Comm’n Op., at 13-14 (Dec. 2009); Certain Variable Speed Wind Turbines and Components Thereof, Inv. No. 337-TA-376, USITC Pub. 3003, Comm’n Op., at 14-18 (Nov.1996).
As noted in the panel opinion in this case, the Commission has consistently construed subparagraph (C) in that manner. See Certain Multimedia Display and Navigation Devices and Systems, Components Thereof, and Products Containing Same (“.Multimedia Display and Navigation Devices”), Inv. No. 337-TA-694, USITC Pub. 4292, Comm’n Op., at 7-8 (Nov.2011) (to satisfy the domestic industry requirement by proof of investment in patent licensing requires a showing (1) that the investment relates to the exploitation of the asserted patent, (2) that it relates to licensing, (3) that it is domestic, and (4) that it is substantial). In addition to the cases cited in the panel opinion, earlier Commission decisions adopting the same statutory interpretation include Certain Digital Processors and Digital Processing Systems, Components Thereof, and Products Containing Same, Inv. No. 337-TA559, Initial Determination (May 11, 2007), 2007 WL 7597610, at *53-*57; Certain Semiconductor Chips with Minimized Chip Package Size and Products Containing Same, Inv. No. 337-TA-432, Order No. 13 (Jan. 24, 2001), 2001 WL 1877710, at *6-*8; Certain Digital Satellite System (DSS) Receivers and Components Thereof, Inv. No. 337-TA-392, USITC Pub. 3418, Initial and Final Recommended Determinations, at 8-10 (Apr. 2001); Certain Dynamic Sequential Gradient Compression Devices and Component Parts Thereof, Inv. No. 337-TA-335, USITC Pub. 2575, Initial Determination, at 58-61 (Nov.1992); and Certain Microcomputer Memory Controllers, Components Thereof and Products Containing Same, Inv. No. 337-TA-331, Order No. 6 (Jan. 8, 1992), 1992 WL 811299, at *3-*4 (“Where the patented products are manufactured is not relevant to the subsection (C) issue.”). The two Commission decisions from the 1990s cited by Nokia are inapposite, as they do not involve licensing, and they do not purport to interpret sub-paragraph (C). The two Commission decisions from the 1990s cited by the dissent are also inapposite, as they involve cases in which the complainants were not exploiting the asserted patents, contrary to paragraph 337(a)(2), which “requires that the domestic industry relate to the articles protected by the patent.” See Certain Integrated Circuit Telecommunication Chips and Products Containing Same Including Dialing Apparatus, Inv. No. 337-TA-337, USITC Pub. 2670, Initial Determination, at 99 n.87 (Aug.1993).
This is a classic case for the application of subparagraph (C). The evidence before the Commission showed that InterDigital is a large, publicly traded company (NASDAQ ticker symbol IDCC). Since 1993, the administrative law judge found, Inter-Digital “has been engaged in research, development, engineering, and licensing of Code Division Multiple Access (CDMA) technology in the United States which *1299 work later transitioned into research, development, engineering, and licensing of Wideband CDMA technology (WCDMA).” InterDigital’s proprietary technology is incorporated in the communications standards referred to as 3G. InterDigital has engaged in some production of products, but it is principally dedicated to research and licensing intellectual property in the cellphone industry. As the administrative law judge found, InterDigital “licenses its wireless technology and patents to significant handset and device manufacturers throughout the world.” Between 1993 and 2006, the evidence showed, InterDigital invested a total of approximately $7.6 million in salaries and benefits for employees engaged in its licensing activities, and it received almost $1 billion in revenues from portfolio licenses (including the patents in suit) relating to its cellphone technology, which includes about $400 million attributable to licenses to its 3G technology. The administrative law judge found (and there is no argument to the contrary) that Inter-Digital’s activities involve “substantial investment in ... licensing.” 19 U.S.C. § 1337(a)(3)(C). The record also reveals substantial investment by InterDigital in the research and development that led to the patents in suit. The only question is whether the InterDigital’s concededly substantial investment in exploitation of its intellectual property is “with respect to the articles protected by the patent.” That requirement is satisfied in this case because the patents in suit protect the technology that is, according to InterDigital’s theory of the case, found in the products that it has licensed and that it is attempting to exclude.
Nokia argues that more is required by the phrase “with respect to the articles protected by the patent,” but it is notably vague about what exactly that is. Nokia concedes that it is not necessary that the “articles” in question be manufactured in the United States (Pet.9 n.1),[1] and it does not assert that the articles in question must be produced by licensees of the pat-entee. Instead, Nokia variously asserts that “there must be ‘articles protected by the patent’ ” (Pet.4), that the only licensing activity that matters is “activity ‘with respect to the articles protected by the patent’ ” (Pet.4), that “the licensing activity must be tethered to a tangible good” (Pet.6), and that the technology covered by the patent must be “put into practical use” (Pet.6). At another point, Nokia asserts that subparagraph 337(a)(3)(C) was designed to allow the Commission “to take action to protect those who do not themselves produce goods practicing their patents, but who work with others to do so” (Pet.9). But that is the very definition of licensing, and as of the time this case was tried, InterDigital had 24 revenue-producing licenses to its U.S. patents, including the patents at issue, with major manufacturers of wireless devices, including Samsung, LG, Matsushita, Apple, and RIM. Whatever Nokia means by the expression “working] with others” to produce goods practicing the patents, it is unclear why that description of the statutory test would not apply to a licensor such as InterDigi-tal.[2]
*1300 2. The statutory language at issue in this case was added to section 337 in 1988. The legislative history of the 1988 amendment to section 337 supports the plain reading of the statute set out above. Nokia attempts to cobble together support for its position from portions of the legislative history, but a fair and comprehensive examination of the legislative background of the amendment makes clear that cases such as this one were precisely the kinds of cases that Congress wanted to bring within the purview of section 337.
Prior to the 1988 amendment, section 337 required proof that that the challenged importation of articles into the United States had the effect or tendency “to destroy or substantially injure an industry, efficiently and economically operated, in the United States, or to prevent the establishment of such an industry.” 19 U.S.C. § 1337(a) (1982). The Commission interpreted that language to require proof of the existence (or prospect) of a domestic industry that was manufacturing the articles protected by intellectual property before the Commission could bar the import of infringing products. See, e.g., Certain Miniature, Battery-Operated, All-Terrain, Wheeled Vehicles, Inv. No. 337-TA-122, USITC Pub. 1300 (Oct.1982), aff'd, Schaper Mfg. Co. v. U.S. Int’l Trade Comm’n, 717 F.2d 1368 (Fed.Cir.1983). Objections were raised that section 337, construed in that manner, did not provide protection for innovators who did not actually produce goods in this country, but who were injured by the importation of goods that incorporated the technology that they had invented or sought to license. Accordingly, proposals were introduced in Congress to expand the coverage of section 337 so that it would provide protection for American industries that did not manufacture products but were engaged in engineering, research and development, or licensing of the technology that others used to make products. Those proposals matured into a statutory change that provided protection for industries that were based on the creation and exploitation of intellectual property even if they did not produce the ultimate products that embodied that technology.
The background of that statutory change and the contemporaneous explanations of why it was made are highly illuminating. Because of certain Commission decisions applying the “industry” requirement of the pre-1988 version of section 337 restrictively, proposals were introduced in Congress to modify or eliminate that requirement. When introducing his bill to amend section 337, Senator Lauten-berg explained that the new legislation was designed to “keep out of the U.S. market products that steal American innovations,” and to “strengthen our ability to exclude products that infringe patents, copyrights, trademarks, and semiconductor designs.” 99 Cong. Rec. 2904 (1986). The amendment was directed at “foreign firms [that] pirate American inventions, and then ship those products back here.” Id. To exclude foreign goods, he added, “proof of piracy should be enough.... If a[n] import infringes U.S. intellectual property rights, it ought to be excluded. And this amendment would make that clear.” Id. He explained that it was not appropriate to require production in the United States in order for section 337 to *1301 be available as a remedy: “Today in order to get relief inventors must exploit their invention by production in the United States. For better or worse, we are more and more an information based economy. For those who make substantial investments in research, there should be a remedy. For those who make substantial investments in the creation of intellectual property and then licensing, there should be a remedy.” Id.
In parallel remarks to the House of Representatives, Representative Kasten-meier noted that an objection had been raised to amending section 337 if it would allow “foreign patent holders ... to use the ITC to seek to exclude either their foreign or American competition from obtaining access to the U.S. market.” That objection would be addressed, he explained, by modifying the domestic injury requirement in the statute “by allowing complaints to be filed by persons who have made a substantial investment in facilities or activities relating to the exploitation of a patent, copyright, trademark, or mask work, including research and development, licensing, sales, and marketing.” 132 Cong. Rec. 7119 (1986). That adjustment, he added, “will assure continued access to the ITC by entities, including universities, who have a substantial stake in the United States,” and it would avoid the result of denying ITC relief “notwithstanding the existence of a larger service industry exploiting the intellectual property right within the United States.” Id. Such a change would “enable universities and small businesses who do not have the capital to actually make the good in the United States to still have access to the ITC forum for the protection of their rights.” Id.
At the hearings on the legislation to amend section 337, there was opposition to the complete elimination of the industry requirement, on the ground that to do so would convert the Commission’s mission from a trade forum into an intellectual property court, and that eliminating the industry requirement would allow foreign owners of U.S. patents to bring exclusion actions before the Commission even though they had no substantial U.S. connections. See Intellectual Property and Trade: Hearings before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the H. Comm, on the Judiciary (“House Judiciary Hearings”), 99th Cong. 6, 23, 470-72 (1986) (statements of Paula Stern, Chairwoman, Int’l Trade Comm’n); Intellectual Property Rights: Hearings before the Subcomm. on Int’l Trade of the S. Finance Comm. (“Senate Hearings”), 99th Cong. 57, 65 (1986) (statements of Paula Stern, Chairwoman, Int’l Trade Comm’n). Those who favored the administration’s proposal to eliminate the industry requirement altogether pointed out that the industry requirement in then-current law “prevents intellectual property owners such as universities and research institutions from using the ITC for enforcing their patents.” House Judiciary Hearings at 48, 61 (statements of Harvey E. Bale, Jr., Assistant U.S. Trade Representative); Trade Reform Legislation: Hearings before the Subcomm. on Trade of the H. Comm, on Ways and Means (“1986 House Ways and Means Hearings”), 99th Cong. 354 (1986) (statement of Clayton Yeutter, U.S. Trade Representative); Senate Hearings at 92 (statement of Harvey E. Bale, Jr., Assistant U.S. Trade Representative). Others favored a compromise in which the industry requirement would be retained but amended to cover “U.S. organizations, universities or private, or even individuals whose function it is to do and license research whether or not they actually manufacture.” 1986 House Ways and Means Hearings at 670 (statement of Richard C. Witte, Vice President, Intellectual Property Owners, Inc.).
In the end, a compromise approach along the lines proposed by Representative *1302 Kastenmeier was adopted. The compromise bill retained the industry requirement but made clear that it would not be necessary for a complainant to prove that patent-protected goods were being produced in this country. Instead, the bill provided that the industry requirement could be met even in the absence of domestic production if there was substantial domestic investment in engineering, research and development, or licensing.
Various private parties, including industry representatives and the Intellectual Property Owners organization expressed support for the compromise bill. See Senate Hearings at 175, 179-80 (statements of Donald H. Swan, Corporate Group Vice President, Monsanto Co.); id. at 188, 193-94 (statements of Richard C. Witte, Vice President, Intellectual Property Owners, Inc.); Comprehensive Trade Legislation: Hearings before the Subcomm. On Trade of the H. Comm, on Ways and Means, 100th Cong. 275 (1987) (statement of William T. Archey, Vice President, U.S. Chamber of Commerce).[3]
The similarly worded House and Senate committee reports on the compromise bill explained that the amendment to section 337 was intended “to strengthen the effectiveness of section 337 in addressing the growing problems being faced by U.S. companies from the importation of articles which infringe U.S. intellectual property rights.” H.R.Rep. No. 100-40, Pt. 1, at 155 (1987) (“House Report”); S.Rep. No. 100-71, at 128 (1987) (“Senate Report”). The legislation achieved that objective by eliminating the requirement to show injury to (or the prevention of the establishment of) a domestic industry as a result of the importation in question. House Report at 155; Senate Report at 128. Nonetheless, Congress retained the requirement that “a U.S. industry relating to the articles or intellectual property right concerned ‘exists or is in the process of being established.’ ” House Report at 156-57; Senate Report at 129. That requirement was being retained, the reports explained, “in order to preclude holders of U.S. intellectual property rights who have no contact with the United States other than owning such intellectual property rights from utilizing section 337.” House Report at 157; Senate Report at 129. While seeking to bar the use of section 337 by patent holders with no connection to the U.S. other than their ownership of a U.S. patent, however, the report made clear that it was intended to protect domestic industries that were exploiting patents through means such as engineering, research and development, or licensing. Those domestic industries, even if not actually producing goods, would nonetheless be beneficiaries of section 337, thus preserving “[t]he purpose of the Commission [which] is to adjudicate trade disputes between U.S. industries and those who seek to import goods from abroad. Retention of the requirement that the statute be utilized on behalf of an industry in the United States [including a licensing industry] retains that essential nexus.” House Report at 157; Senate Report at 129.
Importantly for this case, the reports explained that the new statutory provision “does not require actual production of the article in the United States if it can be demonstrated that significant investment and activities of the type enumerated are taking place in the United States.” House Report at 157; Senate Report at 129. The new statute, the reports added, would “encompass universities and other intellectual property owners who engage in extensive *1303 licensing of their rights to manufacturers.” House Report at 157; Senate Report at 129. The reports again emphasized that the committees did not “want to see this language used as a loophole to the industry requirement,” but intended the new language “to protect from infringement those holders of U.S. intellectual property rights who are engaged in activities genuinely designed to exploit their intellectual property within a reasonable period of time,” exploitation which, by the statutory definition, included substantial investment in engineering, research and development, or licensing. House Report at 157-58; Senate Report at 130.[4]
3. Nokia and the dissent cite three of this court’s decisions in support of its claim that the panel’s decision in this case departs from prior circuit precedent, Alloc, Inc. v. Int’l Trade Comm’n, 342 F.3d 1361 (Fed.Cir.2003); Osram GmbH v. Int’l Trade Comm’n, 505 F.3d 1351 (Fed. Cir.2007), and Crocs, Inc. v. Int’l Trade Comm’n, 598 F.3d 1294 (Fed.Cir.2010). Those cases deserve only brief attention, as they do not address the issue presented in this case. In each case, the question before the court was whether the domestic industry requirement was met based on domestic production, and the question on which the court focused was whether the products of the claimed domestic production were covered by the asserted patent claims. There was no question in those cases as to the scope of subparagraph 337(a)(3)(C), and there was certainly no holding (or even dictum) in any of those cases suggesting that a domestic licensing industry could qualify under subparagraph 337(a)(3)(C) only if goods protected by the patent or patents in suit were produced domestically. This court’s decision in John Mezzalingua Associates v. International Trade Commission, 660 F.3d 1322 (Fed.Cir.2011), also does not support Nokia or the dissent. In that case, the Commission and the court held that the complainant’s litigation expenses did not constitute a substantial investment in exploitation of the asserted patents through licensing; the court did not hold that products covered by the patents had to be manufactured in this country.
íjí }£ if: ‡ ^
Here’s where all this leaves us: Under the clear intent of Congress and the most natural reading of the 1988 amendment, section 337 makes relief available to a party that has a substantial investment in exploitation of a patent through either engineering, research and development, or licensing. It is not necessary that the *1304 party manufacture the product that is protected by the patent, and it is not necessary that any other domestic party manufacture the protected article. As long as the patent covers the article that is the subject of the exclusion proceeding, and as long as the party seeking relief can show that it has a sufficiently substantial investment in the exploitation of the intellectual property to satisfy the domestic industry requirement of the statute, that party is entitled to seek relief under section 337.
When enacting the 1988 amendment to section 337, Congress recognized the development in the United States of industries that devoted substantial investment to the exploitation of patent rights through engineering, research and development, and licensing, but not entailing domestic production of the goods that were protected by those patents. Through subpara-graph 337(a)(3)(C), Congress provided for the International Trade Commission to offer a remedy to those industries upon proof that imported goods infringed valid patent rights, and the Commission has consistently interpreted the statute to authorize it to do so. To the argument that Nokia makes — that the result reached by the Commission would convert the Commission from a trade forum into an intellectual property forum — Congress has already given its response, which is that section 337 protects American industries, including American industries that are built on the exploitation of intellectual property through engineering, research and development, or licensing.

. Although Nokia disclaims that argument, it is the centerpiece of the dissent.

. To the extent Nokia’s argument is based on concern that the statute will be used to grant a remedy to any domestic patent owner, no matter what the scale of its activities in exploiting the patent, both this court and the Commission have made clear that the investment in engineering, research and development, or licensing must be sufficiently substantial to constitute a domestic industry. See John Mezzalingua Assocs. v. Int’l Trade Comm'n, 660 F.3d 1322 (Fed.Cir.2011) (upholding Commission decision that complainant's licensing activities were insufficiently substantial to constitute a domestic industry); Multimedia Display and Navigation Devices, *1300 at 23-25 (holding complainant's activities relating to licensing too limited to constitute a "substantial investment” under subparagraph 337(a)(3)(C)); Stringed Musical Instruments, at 16-17, 25-27 (complainant "has not provided sufficient evidence of substantial investment of the type described in section 337(a)(3)(C) to show that an industry in the United States exists”; " 'mere ownership of a patent ... would not be sufficient to satisfy this test’ ”). Here, furthermore, InterDigital's investment included substantial research and development leading to the patents in suit as well as licensing activity.

. The background and history of the legislation is summarized in detail at several places in the congressional hearings that led to the 1988 amendment to section 337. See House Judiciary Hearings at 497-508; Senate Hearings at 5-20.

. In arguing that proof of a licensing industry under subparagraph 337(a)(3)(C) requires proof that the licensed products are manufactured domestically, the dissent interprets the term “domestic industry” to mean "domestic manufacturing industry.” The statute, however, does not say that, nor does the legislative history. When Congress modified the domestic industry requirement in 1988, it expanded the “industry” category by providing that a licensing business could qualify as a domestic industry if it involved "substantial investment in [a patent’s] exploitation.” To read subparagraph 337(a)(3)(C) as if it required proof of domestic manufacture would ignore that the three subparagraphs of paragraph 337(a)(3) are in the disjunctive and that the required elements of a domestic industry under subparagraphs 337(a)(3)(A) and (B) do not apply to the domestic industry requirement of subparagraph 337(a)(3)(C).
The dissent also interprets references to the word "manufacturer” in the legislative history and Commission decisions to mean "domestic manufacturer,” e.g., dissent at 1308, 1310-11, 1315-16, but there is no basis either in the language or the context of the cited references for reading that qualification into the term. The cited materials merely acknowledge that a sufficiently substantial domestic licensing industry will need to license its technology to a manufacturer somewhere; they do not say that the manufacturer must be domestic.